STATE *v.* JOHN C. WINTERS.

February Term, 1929.

Present: WATSON, C. J., POWERS, SLACK, MOULTON, and WILLCOX, JJ.

Opinion filed March 22, 1929.

38

*Fred G. Bicknell, Herbert G. Tupper,* and *Clarence S. Darrow* (of Chicago, Ill.) for the respondent.

*J. Ward Carver,* Attorney General, *Robert R. Twitchell,* State's attorney, and *Raymond Trainor,* special prosecutor, for the State.

WATSON, C. J.   This is a prosecution on indictment, charging the respondent, John C. Winters, with the murder of Cecelia Gullivan at Windsor, this State, on November 7, 1926.   Much evidence was introduced by the prosecution, and also in defense. The respondent took the witness stand in his own behalf, and testified at great length both in chief and in cross-examination. The jury returned a verdict of guilty of murder in the first degree.   The official transcript, duly certified, and the exhibits in the case, are referred to in the bill of exceptions as a part thereof, and made controlling.   The exceptions shown by the bill are numbered, and those relied upon by respondent in argument, will be referred to by number.

The prosecution was based entirely upon circumstantial evidence.

The evidence on the part of the State tended to show, among other things, the following facts:

That on Monday morning, November 8, 1926, the dead body of Cecelia Gullivan was found in her bed on the sleeping porch at her home in the village of Windsor; that her head had been struck with some cutting instrument; that the appearance of the head indicated that two different implements were used, one on the neck and face, and the other upon the scalp; that there were many cuts upon the head which were made with an edged instrument bevelled on one side; that the body was found lying with the face toward the left as it lay in the bed, wholly undressed, except that it had on a night gown; that there was a large quantity of blood upon the bed and sheets; that in several places near the foot of the bed, below the body, were found sand, gravel, coal ashes, cinders and particles of fine coal or dust, and near where these materials were found were also two scuffs of dirt, one on each side of the body, on the lower sheet itself, which were apparently made by person's feet; that the bed was up tight against the south wall of the sleeping porch, and on that wall about four inches from the top of mattress were dark-colored marks which appeared like foot marks of a shoe; that there were also found in the bed burdock burrs and pieces of burdock burrs (commonly hereinafter called "burdocks"); that the bed pillow was gone; that nothing in the room was disturbed except the bed; that the covering on the bed consisted of two sheets, a quilt and couch cover; that the couch cover was nearer the body than the quilt; that the victim owned the bungalow in which she lived, she having built it about two years prior to her decease; that she was a single woman and lived there alone; that she was the treasurer of the Cone Automatic Machine Company at Windsor, and as such worked in the office continuously and took active management in the affairs of the company, she being a woman of considerable executive and business ability; that she was forty-four years of age; that the autopsy revealed that she had a vaginal tumor, sometimes described as a fibroid uterus, which extended down in such proportions and was of such size that it was impossible for her to have sexual relations with a male person; that this condition had existed in all probability for from five

to ten years prior to her decease; that she was killed on Sunday morning, November 7, between two and four o'clock; that entrance to the house was made by the removal of a cellar window on the north side, the window being found below the house a short distance, on what is known as the Kennedy millpond dam, shortly after the homicide; that in going from the house to the dam, there is a high barbed wire fence with an opening where a person can go through by spreading the strands of barbed wire; that the pillow and pillow-slip used by the decedent on her bed were found tucked under a float which was in the water at the Kennedy millpond dam; and that there were evidences of blood on the pillow and pillow-slip.

It was the claim of the State that, on the evidence, the person who perpetrated the crime went down from the house, and across the dam where the pillow and pillow-slip and cellar window were found; that the pillow-slip had tears in it, indicating that they had been made by some sharp prick, like that of a barb on a barbed wire fence; that respondent lived a short distance from the Kennedy millpond, and, for him to go to his home, the most direct route on foot was to go down through the barbed wire fence and across the Kennedy dam to his house.

Evidence on the part of the prosecution further tended to show that in the afternoon of Monday, the day the homicide was discovered, several officers went together to the home of the respondent in the village of Windsor; that they found him there in bed undressed, except he had on a night shirt; that one of the officers told respondent to get up and dress himself, which he did, that when dressing he picked a burdock off his stocking as he put it on, and threw the burdock on the floor; that one of the officers picked the burdock up, but afterwards threw it away; that when proceeding to dress, respondent called for another pair of trousers, saying one pair was torn; that in the cuffs of the torn pair of trousers were burdocks and coal dust; that while there the officers searched the house for a weapon or weapons used in committing the murder, discovered that morning, and in the course of such search they found concealed under a large amount of old clothing on a couch in the front hall, the chisel (State's 23), a piece of an automobile spring (State's 24) and hereinafter referred to as the "spring," and a bottle containing liquor (State's 28); that later, same day, respondent was taken to the State's prison for detention; that in

the evening of same day, the State's attorney and State Detective Brown being present, there was found on the back side of respondent's left leg above the knee, seven or eight fresh parallel wounds, in the nature of scratches, varying from a quarter of an inch to three inches in length; that respondent was asked about his overcoat and trousers, and about the burdocks and coal dust that were in the cuffs of his trousers and about the scratches on his leg, and about spots on his overcoat and trousers resembling blood, and about his trousers being torn; that in answer he said the spots on his coat and trousers, and coal dust, he did not know where he got them; but thought he must have torn his trousers, getting in or out of his automobile; that he got the scratches on his leg in getting in or out of his automobile; that the trousers which were torn were the trousers he had worn the Saturday night before making the statement, and the overcoat was the one he was wearing the same night. It appeared that the torn trousers were State's 19, and that the overcoat referred to was State's 20. And when testifying in this case, respondent stated the same as he did on the occasion just mentioned, regarding the overcoat and trousers, marked as such exhibits, being the ones worn by him on the night of the homicide. But he denied all knowledge as to how the trousers became torn, and as to where the burdocks came from, and as to where the coal dust and other materials later found in the cuffs of his trousers came from, and as to how the spots on his overcoat and trousers subsequently found, resembling blood, came there.

Respondent testified that he owned the chisel (State's 23) and the spring (State's 24); that on Monday morning November 8, that chisel and another chisel were under old articles of clothing on the couch in the front hall, put there to keep them out of reach of his small children so they would not hurt themselves with them. The spring (State's 24) he testified was also his; that he used it about his building operations; but he did not state why that was put under the same clothing on the couch as was the chisel here in question as an exhibit in the case. And it was fairly within the State's evidence that no other chisel was found at that particular place when such search was made.

Later the chisel and spring, thus put in evidence, as exhibits, were turned over to the State laboratory for critical ex-

amination in connection with the cuts and other wounds appearing on the head (put in evidence as State's 35) of the murdered victim. Such an examination was there made by Dr. Whitney, the Director of the State Laboratory, and his assistant, Dr. Kent, who performed the autopsy on the dead body of the victim, concerning which examination they both gave testimony— substantially alike—in effect that no blood was found on either of those instruments; that the chisel was two inches wide and bevelled on one side, and the spring was one and one-half inches wide and a quarter of an inch thick; that by measurements accurately made, and by fitting these instruments in or on the wounds appearing on the head, it was seen that all the cuts had been made by the use of a sharp instrument, bevelled on one side, such as is State's 23; that the other wounds, such as the welt on the neck, the wound on the bridge of the nose, and over the right eye-brow, corresponded in width with the width of the spring, and the wounds agreed with the thickness of the spring; that about four of the cuts exactly corresponded in length with the width of the chisel, and all cuts not exactly so corresponding, could have been made with the same instrument, if held at an angle or a slanting or glancing blow was struck.

And when giving his testimony in this respect, Dr. Kent, at the request of the State and without objection of respondent, by the use of said Exhibits 23, 24, and 35, demonstrated before the jury, the fitting of the chisel and the spring in or on the different wounds on the head, explaining the shape, size and depth of each wound, and by which instrument it could have been made.

Exceptions 1 and 3. During the direct examination of State's witness Dr. Kent, he gave testimony as to what he saw relative to the position and covering of the body as it lay on the bed, and the condition of the bed and bed clothes as to blood, dirt, and other materials and marks on them, when he arrived at the house and before the body was moved in any way or to any other place or position. The witness was asked concerning the size of the marks at the foot of the sheets that were not loose materials, that were marks on the sheet itself. He answered, "Why, the size of my hand, possibly; the palm of one's hand." Further saying that the marks were of "dirt color" and two of them; that they were at the foot of the sheet, on each side of the body. Being then asked if he formed any

opinion at the time as to whether those marks were made by foot-scuffing, whether they were foot-marks or not, the witness answered, "Yes." By the next question he was asked to state his opinion as to whether those two marks were made by feet or otherwise. Subject to exception, he answered that in his opinion they were made by feet. It is now urged that his opinion was not confined to the facts about which he testified, and that "in this there was error." No other ground is now relied upon, and concerning this it would be enough to say that it is a ground not stated at the time the exception was taken. However, since exception 3 raises substantially the same legal question attempted to be raised by exception 1, as in fact saved, we give it consideration. As applied to this case, it is whether error was committed by allowing a lay witness to give his opinion or conclusion as to how certain marks on the wall at the foot of the bed, or on the sheet, on each side of the body near the foot, described by the witness, appeared to have been made. The appearances called for by the question were incapable of exact and minute description, and there was no error in the rulings. Similar questions were before this Court and determined in *State* v. *Ward,* 61 Vt. 153, 17 Atl. 483. In sustaining the rulings there made in permitting such opinion or conclusion to be stated by the witness, this Court said: "A witness is allowed to state appearances in any case where they are in their nature incapable of exact and minute description, *e.g.,* the health or sanity of a person; the appearance of a person when charged with a crime and 'where the facts are of such a character as to be incapable of being presented with their proper force to anyone but the observer himself, so as to enable the triers to draw a correct or intelligent conclusion from them without the aid of the judgment or opinion of the witness who had the benefit of personal observation; he is allowed to a certain extent, to add his conclusion, judgment or opinion.' " The same holding was had in *State* v. *Felch,* 92 Vt. 477, 105 Atl. 23, and in *Button* v. *Knight,* 95 Vt. 381, 115 Atl. 499.

It appeared that respondent worked in the tool department of the Cone Automatic Machine Company of which, as before observed, the decedent was treasurer, working in the office and taking management in the affairs of the company, during the last year and a half before the homicide in question;

and the State's evidence tended to show that during the summer and fall of 1926, to the time of her death, she, on several occasions, in the performance of her duties in such behalf, came into or through the tool department where the respondent and other employees were working, sometimes stopping to say something to the men in that department, and many times passing through to other departments without stopping; that two or three times when she was thus passing through the tool room where the respondent was working he remarked concerning her, "I would like to get next to her." This evidence was objected to by counsel for respondent, and exception saved. But no ground of objection or exception was stated. The prosecution was further permitted to show that in connection with the remark so made, respondent took a roll of money out if his pocket and threw it on the table, saying, "I would give this to get next to Miss Gullivan." This was also objected to on behalf of the respondent, and exception saved without stating any ground thereof. But these two exceptions, not being briefed by him, are waived.

Further evidence in connection with the foregoing was received without objection, to the effect following: That respondent said he would like to have sexual intercourse with her; that two or three times when she was passing through the tool room, coming from or returning to the office, respondent would grab hold of his private parts and say and do acts and things of the foulest and most detestable character, indicating a lustful desire on his part toward her. Respondent, in testifying, did not deny such actions by him there, but said he did it for the purpose of bothering a fellow in the shop and to cause a laugh. He further testified to knowing where the Gullivan house was, and that "she was single."

Exception 2. The State showed by its witness G. W. Putnam, that on the evening of November 6, he had a talk with respondent near the railway station on Depot Avenue in the village of Windsor; that they went to the station fifteen or twenty minutes before eight o'clock and were there about five minutes before the train arrived from the south; that before the arrival of this train, respondent went over and talked with Mrs. Stephanie Cole in front of her store at the foot of Depot Avenue, that after talking with her, respondent came back to where the witness was standing and told him about her. Sub-

ject to exception by respondent without stating any ground thereof, the witness was permitted to testify that he was then and there told by respondent as follows: "I told her that I had twenty dollars I would like to go out and spend with her in a good time, and she said that wasn't enough." This evidence was offered and, as was that of similar character to which reference was made in the last two paragraphs, was properly received on the question of motive in the instant case. Such evidence tended to show respondent's mind was then fixed on gratifying a lustful purpose had by him (Wills Cir. Ev. 40-42, 47), a purpose, clearly within the tendency of other evidence in the case, operating and inducing him to action in point of time thenceforth to the perpetration of the crime in question some hours later the same night. *State* v. *Lepage,* 57 N. H. 247, 24 A. R. 69. The evidence was competent as throwing light on the state of his mind and subsequent conduct. *People* v. *Majone,* 91 N. Y. 211. Whatever tended to show respondent's feeling toward the person killed was admissible. *People* v. *Kern,* 61 Cal. 244. The witness and respondent were together until about half past eight o'clock, when they separated. The evidence showed that while they were thus together respondent drank considerable intoxicating liquor and showed the effects of it, but not in walking, and the witness did not call him intoxicated; that he was then wearing the same overcoat as is marked State's 20 in this case. The evidence further tended to show that at nine o'clock, same evening, respondent came into a certain pool room and shoe repairing shop in Windsor, remaining there "probably ten minutes"; that while respondent was in there Cecelia Gullivan came in and got a pair of shoes she had there; that during all the time she was in there he "kept his eyes on her and watched her"; that he was then "pretty full"; that respondent was in the pool room later, and about the street until between twenty-five minutes and a quarter of 11 o'clock, then having a bottle with liquor in it, and "had been drinking some"; that between half past eleven o'clock and twelve, he went to the house of Otto Hochstein on Central Street and asked the latter to go with him (respondent) up street to a certain block which he named and gamble with him; that Hochstein refused to go, whereupon respondent, after remaining at the house about five minutes, went away, saying as he was leaving: "If anything happens keep mum."

Exception 4. Wallace L. Fairbanks, the sheriff of Windsor County during all the time material in the prosecution of this indictment, was improved as a witness by the State. He testified that about eleven o'clock in the forenoon of November 8, he went to the house in the village of Windsor where the dead body of Cecelia Gullivan had been found; that when he arrived there he went into the sleeping porch and there noted her body on the bed. Evidence given by other witnesses showed that the body had not been moved since it was first discovered, nor had the bed on which the body lay, nor anything, connected with the bed by way of bedding, nor any of the different objects in the room—everything there was then remaining the same as it was when the dead body was first found. Fairbanks testified that he took charge of the articles later removed from the room, and that the same had since been continuously in his charge or in the charge of his deputy, until they were produced in court. The articles so produced were identified by the witness and put in evidence as exhibits in the case, without objection. Later and during his direct examination, these different articles being so in evidence, the witness was permitted, subject to exception by respondent, to arrange before the jury, the bed, mattress, sheets, quilt, couch cover, and screen in substantially the same relative positions as they were when the witness first viewed the scene. In addition to the general objection and exception to such arrangement being permitted, two specific grounds were stated as follows: (1) "Because it is impossible here in the court room to exactly reproduce the conditions as they were; (2) and we further object to any part of a reproduction unless all of the contents of the rooms are specifically included in the reproduction." Such reproduction, in connection with the testimony of the witness concerning material facts of his own observation and knowledge, was demonstrative evidence tending to show the motive prompting the commission of the crime, and also the way it was committed. The admission of this demonstrative evidence was within the discretion of the trial court and, in the absence of abuse (of which none is here claimed), will not be revised in review. 16 C. J. 618; Hughes v. State, 126 Tenn. 40, 148 S. W. 543, Ann. Cas. 1913D, 1263; State v. Mariano, 37 R. I. 168, 91 Atl. 21; Johnson v. State, 59 N. J. Law, 535, 37 Atl. 949.

As to specific ground (1) of the exception: The admissibility of this demonstration before the jury did not depend upon the exact reproduction of the conditions as they were in the room where the crime was committed. Such exactness would, in most prosecutions based wholly on circumstantial evidence, be impossible and result in the exclusion of what might otherwise be important evidence in aid of a right understanding by the jury. This prosecution may be mentioned as a typical instance of that character. Substantial accuracy with reference to reproducing the relative evidentiary conditions, seemingly the rule followed in the trial court—was sufficient. *People* v. *Cash,* 326 Ill. 104, 157 N. E. 76. Ground (2) is based on the idea that such reproduction, to be permissible, must include specifically all the contents of the room, however immaterial, small, or insignificant as evidence they or any of them might be, and without regard to their several locations in the room relatively or otherwise. The mere statement of this contention sufficiently shows its unsoundness, and we give it no further notice.

Exceptions 5 and 6. During the direct examination of Mrs. Bessie Pandjiris, a witness introduced on the part of the prosecution, the State offered to show that about ten minutes before two o'clock on Sunday morning, November 7, the respondent entered the house at number 7, North Main Street, in the village of Windsor, which house was then occupied by this witness and Miss Margaret Evarts and two other women, Miss Blanche G. Fowle and Miss Minerva Stack, and then and there assaulted the witness with intent to rape her; and offered to show his conversation at that time and place, and his actions with the witness, the prosecution claiming that those actions showed, conclusively, his motive to be that of a felonious ravisher, intent on satisfying the lustful purpose continually active in his mind, the evidence being offered as tending to show respondent's identity, motive, and intent when he committed the crime with which he is charged in this indictment; also further as evidence to show his presence at different places that night.

Counsel for respondent having requested that a more specific offer be made as to what the State claimed constituted the assault upon the witness with intent to commit rape, counsel for the prosecution further stated as follows:

"The evidence will tend to show that this woman was in her bed asleep, and was awakened by the intruder being in her room; that when awakened this intruder, whom we will identify as the respondent, grabbed this woman and struck her and dragged her from her bed onto the floor, and that she fell on her stomach, and that he got on top of her; that he gouged her eyes with his fingers; put .his thumb in her mouth toward her jaw on the side; that he inserted his hand in her vagina, and asked her if she would take it; if she wanted it; that he made a hand insertion in her private parts; that she asked him to let her up; that he did partially, holding her on her left hand; and that then some people came in and he ran. Now we claim that this is clearly good evidence of a man's intent."

Respondent objected to the admission of the evidence offered on the grounds: (1) That respondent's feeling towards this witness indicated nothing as to his feeling toward Cecelia Gullivan; (2) that his mental state, as indicated by what he said and did to the witness, indicated nothing as to his mental state towards Cecelia Gullivan; (3) that his disposition to commit a crime is not admissible; (4) that the commission or attempt to commit a crime, other than the crime with which he is charged, is not admissible, unless there was a causal connection between the previous occurrence and the crime which he is charged.

The court ruled that all this evidence as to the claimed assault upon the witness, on the occasion to which the offer referred, might be received subject to the objections already stated by counsel for respondent, and an exception was noted "without the objections being renewed from time to time."

It is urged that this evidence was offered to show motive and intent, but not for the purpose of identifying the respondent as the perpetrator of the crime charged. But the offer, fairly understood, goes to the extent of such identification. It was that "this respondent" committed the assault upon the witness Pandjiris at the Evarts home, with intent to rape her, and "we offer to show this on the question of motive"—whose motive? respondent's motive—"in connection with the Gullivan murder"; and "to show respondent's presence at different places that night." What different places? Specifically those

50

shown by the context, namely, where the two crimes mentioned therein were committed.

After the State rested its opening case, a motion was made by counsel for respondent that all the evidence of Mrs. Pandjiris and other witnesses who had testified relating to the assault upon her, be stricken out, "for the reason that the evidence does not come up to the offer of the State." Counsel for the respondent, being asked by the court in what respect it did not come up to the offer, answered that the testimony did not tend to show that respondent entered the house with intent to commit rape.

As before observed, and as appears from the facts stated in the forward part of this opinion as being shown by the tendency of the State's evidence, the prosecution was based entirely upon circumstantial evidence. The dead body of Cecelia Gullivan was not discovered until more than thirty hours after the homicide. Adverting to the facts there stated, it is seen that the identity of a perpetrator of the crime charged, the motive to committing it, and intent, were questions involved and (except as to motive), were necessary for the State to establish in the successful prosecution of the indictment. And while it was not necessary to establish motive, evidence tending to show motive was admissible (*State* v. *Ward*, 61 Vt. 153, 17 Atl. 483), and the prosecution being based upon evidence entirely circumstantial, it was important for the State to prove motive if it could (1 Bish. Crim. Proc., § 1107; *People* v. *Thau*, 219 N. Y. 39, 113 N. E. 556, 3 A. L. R. 1537), for "motive is an inducement, or that which leads or tempts the mind to indulge the criminal act." *People* v. *Fitzgerald*, 156 N. Y. 253, 50 N. E. 846.

The question of when evidence of the commission of an extraneous offense is admissible in a trial for the crime charged has been much discussed and authorities cited by this Court. In *State* v. *Kelley*, 65 Vt. 531, 27 Atl. 203, 36 A. S. R. 884, this Court speaking through Munson, J., said among other things:

> "Evidence covering the commission of another offense is also admissible when two crimes are so linked together in point of time or circumstances that one cannot be fully shown without proving the other. It is doubtless true that the criminal acts shown in many of the cases referred to

this rule would come within some phase of the two comprehensive rules hereinafter stated; but it is evident that the circumstantial connection between transactions of a criminal nature may be so intimate as to require proof of them all, independently of other grounds of admission \* \* \* \* \*

"Such evidence is also received to show identity of person, local proximity, or other facts calculated to connect the respondent with the commission of the offense \* \* \* \* \*

"Again, the prosecutor may show motive, purpose, preparation or concealment, even though it involve proof of a distinct crime."

In *State* v. *Sargood*, 77 Vt. 80, 58 Atl. 971, Stafford, J., speaking for the Court said: "We do not understand that it is necessary that when the first crime was committed the purpose to commit the second should be already formed and entertained. It is enough if the commission of the second is so related to the first as to shed a light which may enable the trier to see how, why, or by whom it was committed." And in *State* v. *Donaluzzi*, 94 Vt. 142, 109 Atl. 57, in an opinion by Taylor, J., we said: "The special difficulty disappears if the evidence is considered strictly upon the ground of its relevancy to the issues on trial, regardless of the fact that it may incidentally show the commission of some other offense. It should be observed in this connection, however, that the evidence of other acts is not admissible to prove the commission of the act complained of—the *corpus delicti*. But, speaking generally, such evidence is admissible in a proper case as a means of identifying the respondent as the perpetrator of the crime; or to show motive, intent, or guilty knowledge on his part, when an issue; or as tending to illustrate, characterize, or explain the act, when capable of more than one construction." It is further said in that case:

"Where evidence tending to prove another offense is offered, the same considerations arise with respect to its admissibility as upon the offer of other testimony. The controlling question is: Is the evidence relevant—does it tend to prove any fact material to the issues in the case? \* \* \* If the evidence is admissible on other general grounds, it is no objection to its admission that it discloses other offenses, even though they are indictable."

That the general rule has exceptions of the nature and character asserted above, is not controverted by the learned counsel for the respondent, their contention being that the instant case is one governed by the general rule, not by any of the exceptions to it. In their brief, also in oral arguments of the exceptions presenting such questions, they cite and more particularly rely upon, as supporting their position, what are, perhaps, the two leading cases in this country upon the law of that subject: *State* v. *Lepage,* 57 N. H. 245, 25 A. R. 69, and *People* v. *Molineux,* 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193.

In the Lepage Case, the indictment charged the respondent with the murder of one Josie A. Langmaid, who was killed on the morning of October 4, 1875, while passing over a certain road, on her way to school. The government claimed that the murder was committed ''in perpetrating or attempting to perpetrate rape.''

As tending to show that respondent had an intent to commit such a crime, and that he was making prior preparations therefor, it was held that the State was properly permitted to show, by numerous witnesses that they severally saw him and were talked with or inquired of by him, at different times and places, within a period of ten days next before the crime was committed, concerning the place where one or more girls referred to attended school, and the road traveled by them in so doing; and it was not error for those witnesses to testify to what respondent said in such conversations or inquiries, and the answers they gave him. That court quotes from 1 Wharton American Criminal Law, § 647, with approval, as follows:

''So, proof of a distinct murder, committed by the defendant at a different time, or of some other felony or transaction committed upon or against a different person and at a different time, in which the defendant participated, cannot be admitted until proof has been given establishing or tending to establish the offense with which he is charged, and showing some connection between the different transactions—or such facts or circumstances as will warrant a presumption that the latter grew out of, and was to some extent induced by, some circumstances connected with the former; in which case such circumstances connected with the former as are calculated to show the *quo animo* or

motive by which the person was actuated or influenced in regard to the subsequent transaction are competent and legitimate testimony.''

But a new trial was granted in the Lepage Case, because testimony was admitted under exception, tending to prove that the prisoner, about four and one-half years before the trial, at a place in Canada, committed the crime of rape upon a person other than the deceased. The court said regarding this testimony the question was, "whether that bald, naked fact, being put in evidence, had any tendency to prove any matter in issue between the State and the defendant." The holding was that it did not.

In the Molineux Case (the crime charged being murder), the New York Court of Appeals discussed at great length the law permitting evidence showing or tending to show motive and identity, notwithstanding the evidence so permitted shows the accused guilty of an offense for which he is not on trial. An opinion was written by each of several of the judges who sat in the case, the principal of which were by Judge Werner and by Chief Judge Parker. In the opinion by the latter are cited a large number of cases from different courts concerning which it is said that each one of them presents a case "in which proof of the facts tending to show the commission of another crime by the defendant on trial was admitted for the purpose of aiding in establishing the fact that he committed the offense charged." Addressing himself to the argument attempting to show that evidence authorizing a finding that the defendant there on trial had committed a prior similar offense, was not competent, the real test is stated as follows: "Does the evidence of the other crime fairly aid in establishing the commission by defendant of the crime for which he is being tried? And that test, and none other, is fairly established by the authorities.''

In *People* v. *Thau,* cited above, the indictment charged the defendant with having assaulted the person named, by striking him with a bottle. The defense was an alibi. The appellate division had reversed the judgment of the county court upon the conviction of the defendant on the ground that it was error to admit evidence of a somewhat similar offense about two weeks earlier than the date of the offense charged. In that reversal

opinion it was said that there was no question of identity in the case. That the evidence was not admissible as bearing on the motive with which the assault was committed; and that the two occurrences were so dissimilar that the proof has no tendency to establish the common intent. The Court of Appeals said:

"The rule which excludes evidence of other crimes than that which is charged in the indictment unless the evidence is relevant to the issue or issues on trial should be strictly enforced. On the other hand, where the evidence is relevant the trial court should not hesitate to receive it notwithstanding the fact that it tends to prove the defendant guilty of another offense."

It was held that the evidence was properly received as tending to establish motive, a common scheme or plan, and the identity of the person charged with the crime specified in the indictment. And so the question as presented on both sides of the instant case is, whether the facts and circumstances connected with the offense committed at the Evarts home, constituted relevant evidence as tending to prove any fact material to the issues alleged in the indictment and on trial.

██ ██ Respecting the facts and circumstances connected with the assault at the Evarts house, the evidence on the part of the State tended to show that at or about ten minutes before two o'clock on Sunday morning, November 7, that house was entered by a man who assaulted Mrs. Pandjiris, a nurse in the employ of and caring for Miss Evarts (a helpless invalid) who was sleeping in an adjoining room, the two rooms having an open partition of five or six feet between them without doors, and the head of Miss Evarts' bed extended about twelve inches into that open space; that being awakened by someone moving slowly about in her room, Mrs. Pandjiris, without getting out of bed, switched on a light from an adjustable lamp standing beside the head of her bed; that when the light was so switched on, she saw a man standing in that open space, at the head of Miss Evarts' bed, bent down and looking at her; that as soon as the light was on the man straightened up and looked at Mrs. Pandjiris, and she "got a fine look at his face," and saw that he had on a brown overcoat and a dark sweater; that he at once put his hand in front of his face, she turned out the light, and

he made a quick dash for her bed and struck her a blow on the side of her head and at the same time "flung himself across" her body on the bed; that with all her might she struck him a blow in the chest and grabbed his arms, and in so doing she felt something prick her hand; that she told him to get out there, and he told her not to make a sound, and that if she did he would choke her, that she screamed and he choked her; that he then took her by the arms and pulled her out of bed onto the floor, where she had a hard struggle with him he finally getting her face down, her hands underneath and he on top of her, telling her at the same time that if she made a sound he would kill her; that she asked him what he wanted and he said (quoting from the witness) "there was all kinds of money and diamonds in the house." As to what followed, we further quote from the testimony given by the witness appearing of record: "I told him to take anything he wanted but not to kill me. I offered to show him, to tell him where everything was; I promised not to make any sound; he choked me until my mouth filled with blood, and when he would give me a chance to swallow I could taste that blood. I have long hair, and I did not braid it that night, it was down my back; he took his hand like that (grasping a handful of hair on side of head) and got a fistful and pulled it right out. * * * *"

The testimony of the same witness further tended to show that when down on the floor and the assailant on her back as above stated, he gouged her eyes with his fingers, put his thumb in her mouth and she bit it; that in the struggle on the floor her night-dress got up over her body; that he felt of her buttocks, and made a vaginal insertion with his hand, whereupon she said to him, "What are you going to do?" and he said, "Do you want it?" that by gagging and in that way making all the noise she could, the two women whose rooms were directly overhead on the second floor, heard her, turned on the light in the upper hall, which also lighted the hall on the first floor, and came down stairs to the room of the witness; that this frightened the assailant who, seeing the light in the hall, "took a quick look, turned quickly and darted through the dining room," leaving as he went "a smirch of blood on the white woodwork," and escaped, tearing the screen of the back kitchen door and breaking out the glass; that she had on her night-dress;

and Miss Fowle helped her to put her bath robe on over it; that her nose and mouth were bleeding, and there was blood in her throat; that she at once went out on the front porch and called to the nearest neighbor for help, and a telephone call was sent to the chief of police, and to a doctor.

It appeared that at the time of this assault upon the witness Pandjiris, she was and for some years had been more or less acquainted with the respondent John C. Winters, and knew him well by sight; that he had in two or three previous years been employed on the Evarts Juniper Hill farm, when at the same time for some weeks or months she was a guest in the Evarts house there; and that other than this she had seen him on the streets in Windsor, and in the stores—in all had seen much of him. It appeared from the respondent's testimony that he, in the same way, knew her well, and also Miss Evarts, the invalid.

Adverting to the statement above that as soon as the light was on the man "straightened up and looked at" Mrs. Pandjiris, and she "got a fine look at his face," the witness Pandjiris further testified that she then recognized it as the face of the man she knew, but that she was frightened and did not at that time associate any name with the face; that after the assault she was sick in bed under a doctor's care all that day Sunday; that the next morning (Monday) she associated the name with the face, and when testifying in this case, she said she was positive of her identification of John Winters, the respondent, as the man who assaulted her Sunday morning, November 7. The testimony of the witness in such identification was not opinion merely, it was of the actual knowledge of the witness. *State* v. *Powers*, 72 Vt. 168, 47 Atl. 830.

The same witness further testified that on the following Tuesday evening, the people named below came to the Evarts house: State's Attorney Twitchell, Chief (of police) Degnan, Deputy Sheriff McDermott, Sheriff Fairbanks, State Detective Brown and John Winters; that she was in her room and John Winters was brought in. The witness then being asked if at that time she had any talk with Winters, and answering in the affirmative, was asked to state what it was, and answered: "John Winters asked to have a few words with me. He asked me if he was the man that was in that house that night. I replied,

you are the man that was in this house Sunday morning. He became very excited. He threw both hands up; he said 'I hope to die—I hope they kill me—I hope they hang me for this.' " The next question asked the witness was, if at that time he denied he was the man, and she answered, "No."

The same witness testified further that after her assailant had gone, but on the same morning after she got into bed, she noticed that there were burdocks and sand and black dirt on the lower sheet at the head of her bed, and burdocks on the blanket, and also a burdock on the box spring, at the upper end of the bed; that there were burdocks on both her night-dress and bath robe, when she got up after being sick in bed over Sunday; that there were no burdocks, nor sand, nor black dirt on or about her bed or bed clothes, or her own clothing, before the assault upon her that morning; that on the next Tuesday, Chief of Police Degnan brought to her room an overcoat (State's 20), to see if she could identify it as the one her assailant had on at the time he assaulted her; that it looked like the same overcoat, and in examining it and carefully feeling of it with her hands, she found a burdock on the lower right edge of its skirt, which gave the same prick to her hand as she felt when hold of the sleeve of the coat the night she grabbed the man assaulting her; that after the assault upon her there were bruises upon both of her arms, and several on her chest; that her mouth was turned to one side and badly swollen, her left eye was black and there were scratches on her nose.

The testimony given by the witness Pandjiris, in all its particulars essentially important in the prosecution of this indictment, was corroborated by the testimony of other witnesses, the circumstances shown, and the exhibits in the case, except as to the assault itself made upon her, and that was strongly corroborated by the circumstances and the exhibits.

The evidence of the prosecution further tended to show that on Sunday morning, the seventh, about nine o'clock, several fresh tracks or foot-prints of a person were found near a large elm tree (shown by State's 9) down across the road in front of the Evarts house, and in the dirt on the embankment, leading up the bank from the elm tree to the road and straight toward the Evarts house; that near this elm tree there were two burdock bushes some three or three and one-half feet high which were on Miss Evarts' side of the tree, facing the road;

that the road along there runs practically north and south, is of concrete surface, some higher than the adjoining land on the west side where the elm tree stands, and there was dirt used in making the fill for the road, and a bank of dirt, not grassed over, six or seven feet wide from the edge of the concrete; that there is a space, about thirty-five feet wide, between the rear or east side of the Evarts house and the front of the house directly back of it, the residence of the witness Walter Monroe, in which space there is a road which swings around back onto North Main Street; that sometime during Sunday morning, the seventh, the witness being at home in his sleeping room on the second floor, heard a person running through the yard, towards the railroad track immediately on the east; that before he heard the man running, the witness heard screams and two or more crashes of glass, seemingly two or three blows; that the witness got up and dressed and went over to the Evarts house, where he found Miss Stack, Miss Fowle, Mrs. Pandjiris, and two neighbors who had already arrived; that Mrs. Pandjiris was sitting in the front room and looking as though she had been beaten up, Miss Stack and Miss Fowle being with her; that the witness did not, at that time, look around much, simply went and looked at the rear door where the man broke out: that the four panes of glass in the door were broken out, and the lower corner of the screen was torn out.

The fact that the overcoat (State's 20) and the trousers (State's 19) were, immediately after the Pandjiris assault, and the homicide charged in the indictment, found in respondent's possession having blood on them (according to the tendency of State's evidence), and, on the trial of the indictment were testified to by him as his overcoat and trousers, worn by him on Saturday night, November 6, and the fact, shown by the evidence, that he was positively identified by the witness Pandjiris as the man who assaulted her, corroborated by the circumstances that his thumb which she bit when he put it in her mouth, and his chest when she struck him, afterwards showed marks of injury, that in the course of making such assault he got across her body on the bed where she was lying, and the fact that, immediately after the assault upon her, burdocks and sand and black dirt were found on the lower sheet of her bed, burdocks on the blanket and one on the box spring to the bed, and on her night-dress and bath robe which she wore in bed

that same night after the assault, and the fact that in connection with the commission of the second crime there were left on the bed and bed clothes, by the perpetrator of that foul deed, where it was perpetrated in the sleeping porch where the dead body was later found, the same kinds of materials by way of burdock burrs and pieces of burdock burrs, sand, gravel, cinders and particles of fine coal and dust, as were left on the bed and bed clothes therewith, in the Evarts house when and where the first offense was committed or attempted to be committed, and as were found on the clothing of the respondent, worn by him that night—are all evidentiary facts and circumstances strongly tending to connect the respondent with, and to identify him as the perpetrator of the murder for the commission of which he was on trial.

Furthermore, in point of time, the second crime followed close after the first. Indeed, the evidence tended to show, and the jury will be taken to have found, that the second crime grew out of and was induced by the circumstances attending the first, by reason of which the respondent was frightened away from the Evarts house before accomplishing his intended purpose, and that he immediately went from there to the Gullivan bungalow for a like purpose, continuing under his original plan of action. Such facts and circumstances connected with the first offense were calculated to show and did show the motive by which the respondent was actuated or influenced in regard to the crime charged against him, and were competent and legitimate testimony. *State* v. *Ward, supra.* This holding is also supported by the law stated in 1 Wharton American Criminal Law, § 647, and quoted with approval in the Lapage Case, and by *Comm.* v. *Ferrigan,* 44 Pa. 386. See, also, *Comm.* v. *Snell,* 189 Mass. 12, 75 N. E. 75, 3 L. R. A. (N. S.) 1019; *People* v. *Glass,* 158 Cal. 150, 112 Pac. 281; 16 C. J. 591, § 1139. The fact that when the first crime was attempted, respondent's purpose to commit the second may not have already been formed and entertained, makes no difference. It was enough that the commission of the second was ''so related to the first as to shed a light upon it which'' enabled the jury ''to see how, why, or by whom it was committed.'' *State* v. *Sargood, supra.*

Evidence of what respondent did and said in connection with the first crime, including his mode of action, was relevant in the trial of the indictment, as tending to show his motive to

have been lustful in nature, with intent to gratify his passion by ravishing his victim—a causal connection was thereby shown between the previous occurrence and the crime for the commission of which the respondent was on trial. The same thing as to motive and intent was well within the tendency of the circumstantial evidence of what was done and the mode of action in committing the latter crime.

It is urged in behalf of respondent, under the exception to the overruling of his motion interposed after the State rested its opening case, that there was no evidence tending to show the murder charged to have been committed in perpetrating or attempting to perpetrate rape, and so that exception should be sustained. The only reason set forth in the motion why the evidence, to which reference was there made, should be stricken out, was that it "does not come up to the offer of the State." Counsel for respondent, being then interrogated as to whether he meant that the testimony did not show the respondent "entered that house with intent to commit rape," answered in the affirmative. Since the ground of the motion was then so limited, the exception to the ruling made will be confined within the same limits.

It is said that the State had already introduced evidence to show that the motive and intent of the slayer of Cecelia Gullivan was not robbery, and that no issue of robbery was submitted to the jury; that the evidence was offered and received to show motive and intent to commit rape, but that it was no stronger in support of such motive and intent, than it was to commit robbery; and it is contended that in such circumstances the rule applies, that where a fact is susceptible of two interpretations, the one should be given it which is the more favorable to the respondent. But we need only to examine the evidence legitimately bearing on the question, to be convinced that the rule sought to be invoked has no application. That the intent of robbery did not exist in connection with either crime, was reasonably inferable from the facts and circumstances in evidence; not with the first, because the valuables, by way of money and diamonds, were not sought or interfered with by respondent, even after the victim as before stated, to escape from the death threatened her if she made a sound, offered to tell him where everything was, promising not to make a sound, and told him to take anything he wanted, but not to kill her;

nor with the second, for the valuables of decedent consisting of a purse containing money, watch, diamonds, and pearls, were found after the homicide on the table in the living room, in plain view, untouched.

Moreover, the act of the murderer in getting or attempting to get astride of his victim in her bed, as indicated by the two marks by feet on the lower sheet, one on each side of the body, was consistent with intent to commit rape, but entirely inconsistent with intent of robbery.

The evidence of the first crime was properly admitted on the questions of identity and motive, and there was no error in overruling the motion to strike it out.

Exception 7. Respondent testified in chief that he had owned the trousers (State's 19) a year and a half or two years, and had owned the overcoat (State's 20) two years; that he had not worn the trousers to his work; that he had lost a finger on his left hand, lost it the latter part of April, 1926. He was then asked and testified as follows: "Q. Where were you when you lost that finger? A. At my house, the house I am building. Q. Did you cut that finger off? A. I did. Q. After cutting that finger off where did you go? A. Directly home. Q. And after going directly home, what did you do? A. Called in a doctor. Q. Whom did you call?" Objection being made to this question as immaterial, counsel for respondent stated: "We offer to show that at the time he cut that finger off when he went to have it dressed he wore the trousers that are in this case, and the overcoat." The court asked, "Do you offer to show he got blood on his trousers and coat at that time?" To this counsel answered, "No, we can't, but we can show his opportunity to have done it." The offer was excluded, and exception noted for respondent.

"To reserve an available exception to the exclusion of the testimony of a witness, an offer must be made stating the testimony the witness will give if permitted to testify, and an exception taken to the exclusion of the evidence so offered." *State* v. *Noakes,* 70 Vt. 247, 40 Atl. 249; *Carpenter* v. *Willey,* 65 Vt. 168, 26 Atl. 488.

The burden was upon the respondent, as the excepting party, to produce in this Court a record from which it affirmatively appears that error was committed in the court below. *Randall* v. *Beryl Lumber Co.,* 95 Vt. 158, 113 Atl. 872. And

every presumption is to be made in support of the ruling below which is not positively inconsistent with the record. *Campbell* v. *Patterson,* 7 Vt. 86; *Prior* v. *Wilbur,* 63 Vt. 407, 22 Atl. 74; *Read & Davis* v. *Reynolds,* 95 Vt. 45, 112 Atl. 359. Doubt and uncertainty in the bill of exceptions must be solved against the excepting party. *Bianchi Granite Co.* v. *Terre Haute Monument Co.,* 91 Vt. 177, 99 Atl. 875; *Dent, Admr.* v. *Bellows Falls and Saxtons River St. Ry. Co.,* 95 Vt. 523, 116 Atl. 83; *State* v. *Marino,* 91 Vt. 237, 99 Atl. 882.

Respondent testified that when he cut his finger off he was working on the house he was building; that after cutting it off, he went directly home, and that after going directly home, he called in a doctor. The offer was not to show' that at the time *and place* of cutting the finger off, he was wearing those trousers and overcoat, nor to show that he was wearing them when going "directly home," and before any bandage was put around the finger where cut off, nor even that at the time when he went to have his finger dressed, as stated in the offer, the finger was bleeding, or had any blood so about it as was likely to or might fairly get upon the trousers and overcoat, or either of them. That the finger was bleeding or had blood on it which might get upon those garments, or either of them, at the time to which the offer pointed, was necessary in order to constitute an opportunity. It follows that the offer should have stated specifically the facts, claimed by the exceptant, to constitute the opportunity, which it did not even attempt to do. Without such specific statement, how can it be said that the offer was sufficiently explicit to make the relevancy of the offered evidence apparent to the court, as it must have been to make its exclusion error? *Jericho* v. *Huntington,* 79 Vt. 329, 65 Atl. 87; *Moncion* v. *Bertrand,* 98 Vt. 332, 127 Atl. 371.

Again, the offer had reference, in point of time, to one of two occasions: Either that immediately after the cutting off of the finger, in going "directly home" from the house on which respondent was working, or that of a later day in going from his home to have the finger dressed. The respondent had already, in his direct examination, testified that he had not worn those trousers to his work. The court, when ruling on the question presented, may have had this testimony in mind, as well as that given by him as to the length of time he had owned the trousers and the overcoat, as the basis of the offer. See *Button*

v. *Knight,* 95 Vt. 381, 115 Atl. 499. This being so, the trial court may reasonably have understood the offer as having reference to a later day when respondent went from his home to have the finger dressed. Assuming, without deciding, that if the offer had reference to the time of respondent's going "directly home" immediately after cutting the finger off, the evidence was admissible, yet if in fact it had reference to a later day, then most certainly the likelihood of the finger's bleeding was so small that the statement of the fact of such bleeding would need be included in the offer as a necessary element. It was not so done. Nor does it affirmatively appear as having reference to the former occasion. The record must be so construed as to support the ruling if it can reasonably be done; and that it can be, we have seen. *Button* v. *Knight, supra.*

In view of respondent's testimony already given that he had not worn those trousers to his work, the court may well have thought that the time to which the offer referred was that of a later day, when respondent went from his home to have his finger dressed. Under the law stated above requiring an affirmance of the ruling below when it can reasonably be done, must we not, in the circumstances, indulge the presumption that the offer, in point of time, had reference to the latter occasion, it not being positively inconsistent with the record. To say the least, the time meant by the offer in this respect was so much in doubt and uncertainty that it requires application of the rule that the bill of exceptions be solved against the excepting party.

The writer of this opinion, and Mr. Justice Slack, think that the sufficiency of the offer in question, under this seventh exception, is to be determined by the rules laid down in the cases to which reference is made above in discussing the exception, and that for the reasons stated the exclusion of the offer was not reversible error; that a holding otherwise cannot be had without disregarding said rules and solving all doubts and uncertainties, and making presumptions, in this connection, in favor of the excepting party and against the ruling of the trial court, for which there is no warrant in the rules of law or practice.

The majority of the Court, however, think otherwise, and promulgate, as the law of the case governing said seventh exception, the following opinion.

When this objection was interposed, counsel for the respondent remarked, "It is merely for this purpose. We offer to show that at the time he cut that finger off when he went to have it dressed he wore the trousers that are in this case, and the overcoat." By this statement it is quite apparent that the pending question was asked merely to lead up to the showing covered by the statement. The trial court was then under no obligation to the respondent or his counsel to say or do anything more than make a ruling on the pending question. Had the court so confined itself, the risk of making an offer sufficient in form and content to comply with our rule that an offer must be sufficiently explicit and comprehensive to make its admissibility apparent, would have been upon counsel, and it would be our duty to sustain the exclusion. For it is clear that the offer did not go far enough to show that there was, at the time specified, an opportunity to get blood-stains on the clothing. But the court below did not pursue that course. When counsel made the statement quoted above, the court inquired of him, "Do you offer to show he got blood on his trousers and coat at that time?" To which counsel replied? "No, we can't; but we can show his opportunity to have done it." Whereupon the court said, "Excluded." That the evidence of an opportunity to have gotten the blood spots on his clothing when his finger was being dressed was admissible, is too apparent to require discussion. 1 Wig. Ev. §§ 34, 149. The only question worth considering is whether the proposal of counsel went far enough to save the question for review. The purpose of an offer is to apprise the trial court of the nature of the evidence proposed to be introduced, in order that it may know the precise question to be passed on. It is often difficult to decide upon the sufficiency of an offer, but here the question of the court shows that the court understood just what the nature of the proposed evidence was. In the circumstances shown by this record, a majority of the Court is of opinion that counsel was warranted in the understanding that the whole line of evidence which he was pursuing would be and was excluded unless he could show that blood was actually gotten on the clothing at the time specified, and that his offer or proposal was inadequate only in that it did not cover that fact; so no further offer was made or required. The majority holds that the only reasonable construction of the record is that the court

intended by its ruling to exclude all the evidence, because it did not show the fact inquired about by the court.

The utmost frankness to the court is required from counsel practicing at the bar. Equal frankness is due from the court to counsel practicing at the bar. The majority holds that if the court below did not mean to be understood in the way above indicated, counsel should have been informed about it. The majority does not in any way recede from former holdings regarding the sufficiency of offers of evidence, but simply says that in the peculiar circumstances of this case, no further offer was required.

*Exceptions sustained by a majority of the court, judgment and verdict set aside and a new trial granted. Cause remanded.*

WATSON, C. J., and SLACK, J., dissent as to the holding of the majority as to the seventh exception, and in setting aside the judgment and verdict, and granting a new trial.