## State of Vermont v. John Eugene Kasper, Jr.

[404 A.2d 85]

No. 324-76

Present: Barney, C.J., Daley, Larrow, Billings and Hill, JJ.

Opinion Filed April 5, 1979

*M. Jerome Diamond,* Attorney General, and *Susan R. Harritt,* Assistant Attorney General, Montpelier, for Plaintiff.

*James L. Morse,* Defender General, *Charles S. Martin,* Appellate Defender, and *Kenneth Ampel* and *Richard Peyster,* Law Clerks (On the Brief), Montpelier, for Defendant.

**Hill, J.** In the early evening of December 27, 1975, two masked men entered a small market in Winooski, Vermont. A gun was fired, and one of the men announced their intention to rob the store. After emptying the cash register, they forci-

bly took money from two patrons, pistol whipping one of them in the process. There were five persons in the market during the robbery.

This appeal is brought by John Eugene Kasper, Jr., who, after trial by jury, has been convicted as charged in a two part indictment. Part A charged two violations of 13 V.S.A. § 608(b) (assault and robbery with a dangerous weapon) and one violation of 13 V.S.A. § 608(c) (assault and robbery with a dangerous weapon, bodily injury resulting). Part B charged him with being an "habitual criminal" in violation of 13 V.S.A. § 11. The trial court, relying on the habitual criminal statute, sentenced the defendant to three life terms, one for each conviction. We affirm.

A lengthy recitation of the facts would serve no useful purpose here. They are discussed only insofar as they relate to each of the many claims raised by the appellant.[1]

## I.

One and a half months after the robbery and once the police investigation had focused on the appellant, one of the eyewitnesses to the crime was visited by the police and shown a photographic array of robbery suspects. Twelve photographs were displayed to her, but only eleven individuals were pictured; the appellant's picture appeared twice. Only three of the other persons in the array matched his general description. She selected one of the photographs of the appellant as being of one of the robbers, but she was unable to identify the other photograph of him. The participation of the defendant was established by other evidence.

Of five eyewitnesses to the robbery, only this person was able to identify the appellant as one of the robbers, and only she so identified him at trial. During most of the robbery, which occurred in a brief period of time, she was in close proximity to the man she later identified as Kasper. He was garbed in a nylon stocking mask and wool stocking cap.

---

[1] Two briefs have been filed on behalf of the appellant in this case. The points raised in the brief filed by the Office of the Defender General are discussed in Parts I–VI, XII, and XIV. The points raised in the appellant's pro se brief are discussed in Parts VII–XI, and XIII.

Six days after her initial identification of Kasper, a smaller array of photogaphs was shown to her. The defendant's photograph appeared once. Only one of the other seven individuals pictured matched his general description, and she identified the photograph of the defendant as being of the robber.

Between the time of the robbery and this final identification by photograph, a period of seven weeks, the witness' description of the robber varied.

When the prosecutor moved to introduce the photographs of the defendant that had been selected by the witness in February, defense counsel moved to introduce both arrays in their entirety. The court admitted the arrays as the defendant's exhibits, and the selected photographs were marked as exhibits for the State.

The appellant now contends that the trial court erred in not suppressing the testimony of the eyewitness because the pretrial identification procedures were so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. We disagree.

██ "The duty to exclude objectionable data lies squarely upon the shoulders of defense counsel." *United States* v. *Castenada*, 555 F.2d 605, 610 (7th Cir. 1977). No pretrial motion to suppress the eyewitness' testimony was made, see V.R.Cr.P. 12(b)(3), nor was it objected to at trial. "It is the established rule of this Court that it will not, even in criminal cases, consider questions not raised in the court below." *State* v. *Demag*, 118 Vt. 273, 277, 108 A.2d 390, 393 (1954). We consider this principle "fundamental to the process of judicial review." *State* v. *Murray*, 123 Vt. 232, 233, 186 A.2d 193 (1962). Its purpose is to require that correctable error be addressed initially in the trial court. Its justification lies in promoting fair trials, "maximizing correct decisions and concomitantly minimizing errors requiring mistrials and retrials." *Henry* v. *Mississippi*, 379 U.S. 443, 463 (1965) (Harlan, J., dissenting). Compare *id.* at 448. "If the rule were otherwise, counsel might at times be tempted to remain silent about some fault on the part of the trial court . . . and so, without giving it a chance to correct the situation, arm themselves with ground for reversal if the verdict should go

against them." *State* v. *Hood,* 123 Vt. 273, 277–78, 187 A.2d 499, 502 (1963). See *State* v. *Welch,* 136 Vt. 442, 444, 394 A.2d 1115, 1116 (1978).

This principle is generally, see *State* v. *Hood, supra,* 123 Vt. at 277, 187 A.2d at 502, but not universally accepted, especially when the right at stake is deemed "fundamental" or of constitutional dimension. See *United States* v. *Provencio,* 554 F.2d 361, 363 (9th Cir. 1977). Such misgivings understandably are prompted by the notion that adherence to the rule when faced with an obvious and fundamental error below undermines the credibility of the judicial process.

■ We recognize this danger and our cases avoid it. Where an error is "a glaring error . . . so grave and serious that it strikes at the very heart of [a defendant's] constitutional rights," failure to raise it in the trial court will not bar its assertion here. *State* v. *Morrill,* 127 Vt. 506, 511, 253 A.2d 142, 145 (1969). In such a case, failure to make the claim below has not deprived the trial court of "a fair opportunity to consider, evaluate and rule upon such question." *State* v. *Bressette,* 130 Vt. 321, 322, 292 A.2d 817, 818 (1972). Such a defect should be noticed by the trial judge sua sponte, and the doctrine of *State* v. *Morrill, supra,* requires it if reversal is to be avoided.

■ Addressing the present claim of error in this context, we are not persuaded that these convictions should be reversed. The United States Supreme Court has noted that "the annals of criminal law are rife with instances of mistaken identification" and a major contributing factor "has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." *United States* v. *Wade,* 388 U.S. 218, 228 (1967). The Court has

> recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and

show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, *or if they show him the pictures of several persons among which the photograph of a single such individual recurs* or is in some way emphasized.

*Simmons* v. *United States,* 390 U.S. 377, 383 (1968) (emphasis added).

The suggestiveness of including two photographs of the defendant in the February 10 array is patent, and it was unnecessary because no emergency or other exigent circumstance justified it. Cf. *Stovall* v. *Denno,* 388 U.S. 293 (1967) (imminent death of bedridden eyewitness justified hospital room showup). But the Supreme Court also has indicated that an unnecessary and suggestive pretrial identification procedure does not necessarily violate a defendant's right to due process. In *Manson* v. *Brathwaite,* 432 U.S. 98 (1977), the Court stated that unless the identification procedure reveals " 'a very substantial likelihood of irreparable misidentification,' " it is "content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Id.* at 116 (quoting *Simmons* v. *United States, supra,* 390 U.S. at 384).

■ In *Manson,* the Court concluded that as far as due process is concerned, "reliability is the linchpin in determining the admissibility of identification testimony." *Id.* at 114. To determine whether such testimony is admissible certain indicia of reliability must be weighed against the corrupting effect of the suggestive identification itself. *Id.* "These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demon-

strated at the confrontation, and the time between the crime and the confrontation." *Id.*

Applying this analysis, our conclusion is that the eyewitness' identification—although preceded by a suggestive and unnecessary pretrial identification—was sufficiently reliable for the trial court to submit it to the jury. The witness had an adequate opportunity to view the robber. According to her testimony, she was able to view him face to face, and the stocking cap and nylon stocking mask he was wearing did not so distort his features or obstruct her vision so as to prevent her from obtaining an accurate description. She was in close proximity to him during the entire course of the robbery, and the interior of the market was well lighted. The witness testified that during the robbery it was her goal to obtain an accurate description of the robber, and while the appellant points to variations in her description of him, we do not find these so striking as to evince "a very substantial likelihood of irreparable misidentification." *Simmons* v. *United States, supra,* 390 U.S. at 384. Furthermore, the witness testified that she was positive that the defendant was the man who committed the robbery, and she also was positive of that fact when she selected his photograph from the first array. Finally, the first identification came only one and a half months after the crime. Cf. *Neil* v. *Biggers,* 409 U.S. 188 (1972) (permitting eyewitness testimony where initial identification occurred seven months after crime and was prompted by a suggestive pretrial showup).

In these circumstances we cannot say that the trial court should have excluded the eyewitness' testimony sua sponte; only glaring error requires that, and by definition such an error must be obvious or manifest. Cf. *United States* v. *Meadows,* 523 F.2d 365, 368 (5th Cir. 1975) (plain error can be invoked only where irregularity was obvious or manifest). That factor is absent here. We reaffirm our holding in *State* v. *Leavitt,* 133 Vt. 35, 329 A.2d 627 (1974), that " '[t]he danger that the use of the [photographic identification] technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for

error.' " *Id.* at 39, 329 A.2d at 629 (quoting *Simmons* v. *United States, supra,* 390 U.S. at 384) (alterations in original). The trial judge recognized the importance of this defense and protected its efficacy by admitting into evidence—as defense exhibits for consideration by the jury—the photographic arrays used to secure the pretrial identifications. On this point there is no error.

## II.

On January 11, 1976, the appellant was taken into custody by South Burlington police on an alleged parole violation. While in custody, he made an exculpatory statement to an interrogating officer concerning his whereabouts at the time of the crime. This statement proved to be false and was introduced against him at trial.

On direct examination by the prosecution, the interrogating officer testified that he read the defendant his *Miranda* rights and advised him of his status as a suspect in the robbery investigation. He further testified that the defendant acknowledged his rights and agreed to answer questions. No other evidence concerning the interrogation, except the false alibi itself, was introduced. The defendant's attorney objected to this on the ground that a false alibi is not admissible unless a defendant has given notice of an alibi defense, but he declined the opportunity to object on any other ground.

Two objections to this statement now have been raised. First, the appellant contends that its use against him violated his constitutional rights under *Miranda* v. *Arizona,* 384 U.S. 436 (1966), because "the prosecution [failed to] clearly demonstrate that the defendant knowingly and intelligently waived such rights." *State* v. *Hohman,* 136 Vt. 341, 351, 392 A.2d 935, 941 (1978). Second, he renews the objection he made below and claims that the trial court erred when it allowed these statements into evidence even though the defendant did not give pretrial notice of an alibi defense, see V.R. Cr.P. 12.1, did not raise that defense at trial, and did not take the witness stand to testify in his own defense. We reject both of these arguments.

■ In this case no motion to suppress the statement was filed under Rule 12(b)(3), compare *State* v. *Howe*, 136 Vt. 53, 386 A.2d 1125 (1978), no *Miranda* based objection to the interrogating officer's testimony was offered at trial, compare *State* v. *Killary*, 133 Vt. 604, 349 A.2d 216 (1975), and no request to charge the jury on the issue of voluntariness was made, compare *State* v. *Rocheleau*, 131 Vt. 563, 313 A.2d 33 (1973). That this constitutes waiver is beyond question. See V.R.Cr.P. 12(b)(3), 12(c), 12(e), and 12(g). In these circumstances, the testimony of the interrogating officer was sufficient to establish that the appellant waived his rights under *Miranda* and volunteered a false alibi. Cf. *Miranda* v. *Arizona, supra*, 384 U.S. at 475 ("An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.")

■■ The appellant's second objection to this evidence also is without merit. The established law of this jurisdiction is that this type of knowing falsification by a defendant is admissible for the purpose of showing a consciousness of guilt. *State* v. *Stacy*, 104 Vt. 379, 397–98, 160 A. 257, 265 (1932); *State* v. *Harrison*, 66 Vt. 523, 528, 29 A. 807, 808 (1894). The admissibility of such evidence does not depend on an alibi defense or on the defendant taking the witness stand; it may be admitted as part of the State's case in chief. See *United States* v. *McConney*, 329 F.2d 467, 470 (2d Cir. 1964); *United States* v. *Smolin*, 182 F.2d 782, 785–86 (2d Cir. 1950).

The appellant relies on *State* v. *Jost*, 127 Vt. 120, 241 A.2d 316 (1968). But *Jost* merely holds that a defendant's prior statements which might be construed as inconsistent with innocence will not cure an insufficiency in the evidence. *Id.* at 128, 241 A.2d at 322. There is no insufficiency in the evidence present in the instant case, and admitting the false alibi in evidence was not error.

### III.

In January of 1976 the South Burlington police were contacted by an acquaintance of the appellant who was himself a suspect in the Winooski robbery investigation. He claimed that Kasper telephoned him on the morning of the robbery to ask him if he wanted to make some money robbing a store, and that he declined. He offered to help the police in their investigation in return for prosecutorial consideration. They accepted his offer and he became an informant. No promise that criminal prosecution would not be brought against him was made, but he was told that any judge sentencing him would be advised of his cooperation in the robbery investigation.

The informant was given a tape recorder and instructed to record his telephone conversations with Kasper. While in custody for the alleged parole violation, the appellant telephoned the informant to solicit his aid in corroborating the false alibi he had given to the police on January 11, 1976. See Part II, *supra*. Other telephone conversations between the appellant and the informant followed during the former's week-long incarceration. The informant recorded them and excerpts of those recordings were played to the jury at Kasper's trial. They were extremely damaging to the defendant.

Prior to trial, the defendant's attorney moved to suppress the recordings on the ground that they were obtained in violation of the defendant's Fourth Amendment rights. The motion was denied and that ruling has not been challenged. Now the appellant contends that gathering the evidence in this fashion and using it against him violated his Fifth Amendment rights under *Miranda* v. *Arizona, supra,* and his Sixth Amendment right to counsel under *Massiah* v. *United States,* 377 U.S. 201 (1964). These arguments were not presented to the court below, and they are not properly before us. "[W]here a party has shifted his position on appeal and advances arguments available but not pressed below, and where that party has had ample opportunity to make the point in the trial court in a timely manner, waiver will bar raising the issue on appeal." *United States* v. *Braunig,* 553 F.2d 777, 780 (2d Cir.) (cita-

tions omitted), *cert. denied,* 431 U.S. 959 (1977). See *State* v. *Bromley,* 117 Vt. 228, 230–31, 88 A.2d 833, 835 (1952). Cf. *United States* v. *Brown,* 555 F.2d 407, 420 (5th Cir. 1977) (closer scrutiny may be appropriate where objection on appeal related to objection below), *cert. denied,* 435 U.S. 904 (1978). Recognizing his procedural default, the appellant raises the prospect of glaring error.

The appellant relies on our language in *State* v. *Killary,* 133 Vt. 604, 349 A.2d 216 (1975) that "any statement given spontaneously and voluntarily without any compelling influences is admissible into evidence, even if given to an undercover agent, as long as the agent was not 'planted' for the sole purpose of investigating the accused." *Id.* at 606, 349 A.2d at 217. The failure to raise this claim below has left the record in an ambiguous state. It does reveal, however, that the telephone conversations in question were initiated by the appellant. Furthermore, this informant was not planted at all but rather was well acquainted with the appellant before the robbery even occurred. In *Killary,* the police agent was a paid undercover narcotics informer who was placed in jail "to protect his cover." *Id.* There we held the defendant's statement admissible, and we find a like result appropriate here because of the informant's status and the failure of the record to demonstrate that these conversations were anything other than spontaneous and voluntary. See *id.* at 606, 349 A.2d at 217–18.

For this same reason, the appellant's reliance on *Massiah* v. *United States, supra,* for his Sixth Amendment claim is misplaced. "[T]he clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation *when the government interrogates him." Brewer* v. *Williams,* 430 U.S. 387, 401 (1977) (emphasis added). Finding no interrogation in the record, the appellant's claim of error must fail. See *United States* v. *Hearst,* 563 F.2d 1331, 1347–48 (9th Cir. 1977).

## IV.

On January 10, 1976, the day before his arrest on the alleged parole violation, the appellant contacted the inform-

ant and requested that he drive to Montpelier and give him a ride back to Burlington. The informant did so, but before he left for Montpelier the police secreted an electronic eavesdropping device on his person. This device required the police to follow the informant's car in order to receive the transmissions, which they did. Their vehicle also was equipped with a recording device, but it failed to preserve the transmissions. The officers did testify at the trial, however, as to the conversation they overheard between Kasper and the informant. See Part VII, *infra*. During that conversation the appellant made several admissions that implicated him in the robbery.

He contends that the trial court unduly restricted his defense attorney's cross-examination of one of these witnesses, a South Burlington policeman characterized at trial as the informant's "control officer." On direct examination the officer gave limited testimony concerning the eavesdropping operation and detailed testimony regarding its mechanics. The majority of his direct testimony involved the information he obtained by eavesdropping on the conversation between the informant and Kasper that occurred during the automobile trip from Montpelier to Burlington.

On cross-examination the following occurred.

Q. Mr. Murray [the prosecutor] asked if you had any prior contact with Mr. ............ [the informant]; and you answered that you had?

A. Yes.

Q. Mr. ............ had become an informer for you; is that correct?

MR. MURRAY: Your Honor, could we approach the bench, please?

THE COURT: Yes.

*At the bench*

MR. MURRAY: Your Honor, I object to this line of questioning. [The informant's] background and his connection with the police have already been gone into by Mr. Murdoch [the defense attorney] with [him]. This witness—if Mr. Murdoch wishes to call this witness as his own, we have no objection. But I believe these questions are certainly beyond the scope of direct examination.

MR. MURDOCH: First of all, it's cross-examination. And second of all, he has testified as to conversations that he recollected that he overheard and then subsequently wrote down. He's also testified to conversations with Mr. ............ and Mr. Kasper. Now, there has been some evidence in this case that Mr. ............ is an informer. And we think since this was the man who was managing the informer we ought to find out whether he asked Mr. ............ to set up any type of situation in terms of conversations he attempted to elicit. I think it goes to testing the truthfulness of the conversations that he just testified to.

MR. MURRAY: Your Honor, I don't see how any conversation—

THE COURT: No. I'm sorry to disagree with you in that.

MR. MURDOCH: You're not going to allow me to go into anything about [the informant]?

THE COURT: I didn't say that.

MR. MURDOCH: I asked him about the relation as manager and informer.

THE COURT: That is not within the scope of direct examination of [the control officer].

It now is argued that the disallowed line of questioning was intended to serve two purposes, first, to directly impeach the officer's testimony and second, to collaterally attack the credibility of the informant. Excluding testimony designed to serve either purpose, it is argued, was an abuse of discretion by the trial court that rises to the level of reversible error. We disagree.

■ First of all, no question of the cross-examiner actually was excluded by the court. "The burden was upon the defendant to produce in this Court a record from which it affirmatively appears that error was committed in the court below." *State* v. *Beckenbach*, 136 Vt. 557, 561, 397 A.2d 79, 81 (1978). That burden has not been met here. The court indicated that it was not foreclosing inquiry into matters involving the informant. The defense attorney, however, never asked the witness another question about the informant. We find it reasonable to require some diligence on the part of counsel in

pressing an evidentiary point that is the subject of an ambiguous exchange before a claim of error involving that exchange will be made the basis of an order for a new trial. The questions of trial counsel must delineate the scope of the trial court's ruling if meaningful review is to be assured. In the absence of such advocacy the trial court and this Court must necessarily speculate as to nature of the error, and that is not required.

Furthermore, even if we considered the question excluded, we would not reverse the ruling. In response to the prosecutor's objection, the defendant's attorney offered the trial court an explanation of what he was attempting to accomplish with his questions. "To be sure, on cross-examination counsel was not obliged to make an offer [of proof,]" *Abbadessa* v. *Tegu*, 122 Vt. 338, 343, 173 A.2d 153, 156 (1961), but having exercised the right to do so, see *id.*, he assumed limited responsibility for the ruling. See *State* v. *Winters*, 102 Vt. 36, 61, 145 A. 413, 423 (1929). On appeal doubt and uncertainty in the offer will be resolved against the party making it, see *State* v. *Winters, supra,* 102 Vt. at 62, 145 A. at 423, "[a]nd every presumption is to be made in support of the ruling below which is not positively inconsistent with the record." *Id.* at 61–62, 145 A. at 423.

Our reading of this offer leads us to the conclusion that the trial judge understood it as attacking the credibility of the informant only. There was nothing in the question objected to that tended to affect the credibility of the witness control officer. When the trial court reasonably understands an offer of proof to voice a particular objection to an evidentiary ruling, alternative objections may not first be raised on appeal. *Russell* v. *Pare*, 132 Vt. 397, 408–09, 321 A.2d 77, 85 (1974). See *State* v. *Teitle,* 117 Vt. 190, 200, 90 A.2d 562, 569 (1952). This is an extension of the well-settled rule that where the trial court did not have a fair opportunity to rule on an issue it may not be raised for the first time on appeal. *Russell* v. *Pare, supra; State* v. *Murray, supra,* 123 Vt. at 233, 186 A.2d 193.

■ Viewing the court's ruling from this perspective, there is no error.

> Cross-examination normally only goes to that which limits, explains, or refutes direct examination or modifies the inferences to be drawn therefrom. The exception is the issue of credibility. The credibility of a witness is always open to attack, and wide latitude should be allowed on cross-examination for the purpose of showing who and what the witness is, and that he is unreliable, prejudiced, or biased.

*State* v. *Berard,* 132 Vt. 138, 147, 315 A.2d 501, 508 (1974) (citations omitted). The appellant would have us extend the *Berard* case to permit questioning beyond the scope of direct examination provided it collaterally attacks the credibility of any witness. We are not inclined to do so. The limited exception of *Berard* goes to the credibility of the witness on the stand. If counsel was intent on attacking the credibility of another witness, he could have, as the prosecutor noted in his objection, made the control officer his own witness.[2]

## V.

The next claim of error involves that portion of the indictment that charged the appellant with being an habitual criminal. Prior to trial, his attorney filed a motion to dismiss the charge on the ground that the statute was being unequally applied in violation of the Equal Protection Clause of the Fourteenth Amendment. A pretrial hearing on the motion revealed that Kasper was charged with being an habitual criminal because he refused to plead guilty to the three robbery charges and give the police information concerning serious offenders (or serious offenses) that he was aware of.

---

[2] "Except for its salutory [*sic*] effect on the trial court it is almost always undesirable to reverse on the scope of cross-examination since this usually only involves the question of order of proof." Note, *The Limiting Effect of Direct Examination upon the Scope of Cross-Examination,* 37 Colum. L. Rev. 1373, 1381 (1937). "The witness can usually be called by the cross-examiner and asked the same questions." *Id.* at n.57.

The prosecutor made it clear that he was willing to drop the habitual criminal charge only if the information supplied by Kasper led to convictions. Kasper also was told that even if he cooperated the prosecutor would seek a substantial term of imprisonment on the robbery charges.

 Again, the appellant has shifted position on appeal. He now claims that the prosecutor unconstitutionally penalized him for exercising his Fifth Amendment right to remain silent and his Sixth Amendment right to trial by jury. Since this claim was not raised below, we address it only to determine whether glaring error exists. See Part III, *supra.* We find none.

The appellant admits that bad faith or vindictiveness on the part of the prosecutor "does not come out in plain language in the testimony [at the pretrial hearing.]." In fact, there is nothing in the record to suggest that he was charged as an habitual criminal for any reason other than his failure to accept the prosecutor's offer.

In *Bordenkircher* v. *Hayes,* 434 U.S. 357 (1978), the United States Supreme Court held that a prosecutor's interest in persuading a defendant to forego his right to plead not guilty is constitutionally legitimate and that interest may be furthered by threatening a defendant with more serious charges on which he is plainly subject to prosecution if he refuses to plead guilty to a lesser charge. 434 U.S. at 364–65. The appellant attempts to distinguish that case on the ground that here his right to remain silent and the rights of other persons are implicated. He argues that this made it difficult if not impossible for him adequately to evaluate whether to accept the prosecutor's offer, relying on a footnote to the *Bordenkircher* opinion which reads:

> This case does not involve the constitutional implications of a prosecutor's offer during plea bargaining of adverse or lenient treatment for some person *other* than the accused which might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks a defendant must consider.

434 U.S. at 364 n.8 (citations omitted).

First, the *Bordenkircher* opinion, while acknowledging the coercion inherent in a prosecutor's conduct toward some person other than the accused, ultimately is concerned with the likelihood that a guilty plea arising out of the contemporary plea bargaining process is not the product of the accused's free will. See 434 U.S. at 363–64. Thus the personal relationship between the accused and the other person or persons involved appears to be of paramount importance. See ALI Model Code of Pre-Arraignment Procedure, Commentary to § 350.3, 615–16 (1975) (cited in *Bordenkircher* v. *Hayes, supra,* 434 U.S. at 364 n.8). We cannot assess the relative voluntariness of the accused's choice here without a showing of just who the persons were that he refused to incriminate.

Second, while it may serve as a convenient shorthand expression, there is no Fifth Amendment right to remain silent. There is a right to not be compelled to be a witness against oneself in a criminal proceeding. U.S. Const. amend. V. Furthermore, the United States Supreme Court has recognized that "both federal and state courts have usually held that [the Fifth Amendment] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." *Schmerber* v. *California,* 384 U.S. 757, 764 (1966) (quoted in *United States* v. *Wade, supra,* 388 U.S. at 223). We are equally confident that the Amendment fails to confer on an accused the privilege to remain silent about the crimes of others, at least where there is no showing that the practical effect of such disclosures will be to incriminate him. See *Couch* v. *United States,* 409 U.S. 322, 328–29 (1973); *United States* v. *Johnson,* 165 F.2d 42, 50 (3d Cir. 1947), *cert. denied,* 332 U.S. 852 (1948). It is not surprising—given the procedural context in which this claim is raised—that no such showing has been made.

Both of the difficulties with this claim center on the state of the record and point out the difficulties with shifting grounds on appeal. A defendant must substantiate this type of challenge with evidence at a pretrial hearing or trial, and he

is not free on appeal to roam at will through a voluminous record and point to potential error that appears in hindsight. The appellant has attempted to do so here, and the effort must fail.

## VI.

The appellant contends that both Parts A and B of the indictment on which he was convicted are fatally defective because they fail to conclude with the words "against the peace and dignity of the State," as required by V.R.Cr.P. 7 and the Vermont Constitution, chapter II, § 39. We disagree.

██ "A constitutional right is not incapable of being waived by a [defendant] in a criminal proceeding." *State* v. *McGrath,* 130 Vt. 400, 405, 296 A.2d 636, 639 (1972). The Vermont Rules of Criminal Procedure require that this type of objection be raised at a pretrial hearing. See V.R.Cr.P. 12(b)(2), 12(c), 12(e), and 12(g). That requirement was not complied with in the instant case, nor was the claim otherwise raised below. We therefore decline to consider it now, *State* v. *Morrill, supra,* especially in view of our recent decision reaffirming the principle "that the inclusion of the words 'against the peace and dignity of the State' in an indictment is merely a matter of form." *State* v. *Bell,* 136 Vt. 144, 146, 385 A.2d 1094, 1095 (1978).

## VII.

The appellant contends that the trial court erred by admitting into evidence the testimony of the police officers who electronically eavesdropped on his conversations with the informant during their automobile trip from Montpelier to Burlington. See Part IV, *supra.* His claim is that their testimony was inadmissible because no tape recording or other accurate record of those conversations was produced due to a malfunction in the recording equipment.

██ The testimony of the police officers and the informant which now is made the basis of a claim of error came in without objection. "An objection to evidence must be made at the time it is offered. Where evidence comes in without objection, all right of objection is waived. No question may be

brought to this Court except upon which it is made to appear that the trial court has had fair opportunity to pass judgment." *State* v. *Ladabouche,* 127 Vt. 171, 174, 243 A.2d 769, 771–72 (1968). For this reason, the claim cannot now be raised.

## VIII.

Prior to trial, the State requested and was granted a nontestimonial identification order to procure a hair sample from the defendant to submit to the police laboratory for analysis. In addition to the defendant's hair, the laboratory also had hair samples from two hats found near the scene of the crime. The analysis found these to be incompatible with the defendant's hair. The appellant, in his pro se brief, contends that the State suppressed this evidence.

The supplemental printed case contains an affidavit from defense counsel stating that he was "fully informed of the lab testing and the results in connection with the hair sample and . . . satisfied that full disclosure pursuant to the Vermont Rules of Criminal Procedure was made to me by the State's Attorney." This affidavit is not part of the record because it never was filed in the lower court. See V.R.A.P. 10. If we were to consider it now we would be acting as a trier of fact; this is not the function of an appellate court. See *In re Wright,* 131 Vt. 473, 490, 310 A.2d 1, 10 (1973).

The claim here is that the prosecution suppressed evidence which the appellant now has discovered. Such a claim is to be raised by including it in a motion for a new trial under V.R.Cr.P. 33. This has not been done. We cannot even ascertain whether one or both of the two discovered hats were used in the robbery. The record on appeal fails to present any ruling for us to review. The claim therefore is not before us. *State* v. *Demag, supra.*

## IX.

The appellant also claims in his pro se brief that his defense attorney was denied the right to cross-examine the State's identification witness on matters going into her life style and

position in the community as it might have affected her bias and interest in the case. We disagree.

 The portion of the transcript to which the appellant objects discloses the following.

Q: Are you separated or divorced at this time?

MR. MURRAY [the prosecutor]: Your Honor, I don't mean to. . . . I have an objection to that question, I guess. It's not relevant.

MR. MURDOCH [the defense attorney]: I think it is relevant.

MR. MURRAY: That she's divorced, that's relevant?

MR. MURDOCH: I'm not going to argue.

The defense attorney immediately turned to another subject. Consequently, there was no ruling from the trial court on the objection. Where counsel abandons a question or line of questioning before the court has ruled that he must do so, there is no basis for a claim of error.

## X.

 The defendant's attorney filed a pretrial discovery motion to obtain psychiatric reports made to the Vermont Department of Corrections about the mental health of the informant in this case. The Department of Corrections resisted disclosure on the ground the reports were confidential. The presiding judge reviewed the documents alone in chambers and denied the motion. He stated for the record "that no material information other than the information already within the knowledge of the Defendant's counsel was included in any of the [documents.]." The appellant claims that denying the motion was error. We disagree.

While he relies on V.R.Cr.P. 16, the appellant has failed to indicate what portion of that rule requires the result he now urges upon us. In our opinion, only two provisions of the Rule arguably apply to the case, and neither requires us to reverse the trial court's ruling.

The two provisions involved here are V.R.Cr.P. 16(a)(2) (C) and (D).[3] They provide as follows:

(a) *Prosecutor's Obligations.* Except as provided in subdivision (d) of this rule for matters not subject to disclosure and in Rule 16.2(d) for protective orders, upon a plea of not guilty the prosecuting attorney shall upon request of the defendant made in writing or in open court at his appearance under Rule 5 or at any time thereafter . . . .

(2) Disclose to defendant's attorney and permit him to inspect and copy or photograph within a reasonable time the following material or information within the prosecuting attorney's possession, custody, or control: . . . .

(C) any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons;

(D) any books, papers, documents, photographs (including motion pictures and video tapes), or tangible objects, buildings or places or copies or portions thereof, which are material to the preparation of the defense or which the prosecuting attorney intends to use in the hearing or trial or which were obtained from or belong to the defendant;

Subparagraph (C) does not apply because these reports were completed long before the crime involved here. Thus, they were not "made in connection with the particular case." Nor do we find subparagraph (D) of assistance to the appellant because our review of the reports—which were sealed and made part of the record—discloses that they do not contain any information "material to the preparation of the

---

[3] On March 17, 1977, Rule 16(a)(2) was amended by adding subparagraph (G), effective May 1, 1977. That provision requires production of "any other material or information not protected from disclosure under subdivision (d) of this rule that is necessary to the preparation of the defense." Because the ruling challenged here was made on October 27, 1976, we decline to comment on the impact of this amendment.

defense." Since that requirement is not fulfilled here, the appellant's claim must fail.

## XI.

The appellant argues that the State knowingly permitted one of its witnesses to testify falsely on a material matter. He has submitted copies of the witness' statement to the FBI, her deposition in the case, and her testimony at trial. Again, this type of claim must be brought before the trial court by inclusion in a motion for a new trial, see V.R.Cr.P. 33, and that was not done here. However, in view of the fact that the documents relied on are before us, we have reviewed them and find nothing therein to suggest that the witness perjured herself. Even if we were to assume that this testimony is false, there is no support for the allegation that the prosecutor knew of that falsity.

## XII.

▆▆▆▆ In his closing argument, the defendant's attorney commented on the relatively small amount of evidence obtained by the police from the eavesdropping device placed on the informant's telephone. In his rebuttal argument, the prosecuting attorney stated:

> [Defense counsel] told you that there were all kinds of telephone conversations that were taped by [the informant]; and that from all these telephone conversations you only have excerpts—two brief excerpts—from two. Perhaps, [defense counsel] was suggesting to you that we should have played all those tapes for you. [He] had access to all those tapes; and you can rest assured, ladies and gentlemen, that if there is anything on those tapes that indicate the Defendant was not guilty of this robbery they would have been played for you in this courtroom.

Defense counsel moved for a mistrial on the ground that this comment was so prejudicial as to deny the defendant a fair trial. He argued that it placed upon the defendant the burden of proving his innocence, encouraged the jury to speculate concerning the content of the undisclosed record-

ings, and allowed them to infer that the tapes contained evidence damaging to the defendant. The trial court denied the motion, and the defendant appeals that ruling. We affirm.

The defendant's attorney did not request an admonishment to the jury, nor did he request that the prosecutor's comment be struck. He did request that the court's charge emphasize that the defendant had no burden of going forward with evidence. In accordance with V.R.Cr.P. 30, he objected to the charge on several grounds, see Part XIII, *infra,* but not on the ground that it failed to adequately cover the prosecutor's comment to the jury. For this reason, the only issue before us is whether the trial court abused its discretion in finding that the comment was not sufficiently prejudicial to warrant granting the defendant's motion for a new trial. Compare *State* v. *Lapham,* 135 Vt. 393, 405–08, 377 A.2d 249, 256–58 (1977) with *State* v. *Quesnel,* 124 Vt. 491, 495, 207 A.2d 155, 157–58 (1965).

This comment was not "manifestly intended to be, [n]or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *State* v. *Norton,* 134 Vt. 100, 106, 353 A.2d 324, 327 (1976) (quoting *United States ex rel. Leak* v. *Follette,* 418 F.2d 1266, 1269 (2d Cir. 1969)). It did not, therefore, infringe the appellant's Fifth Amendment privilege against self-incrimination. *Id.; Lussier* v. *Gunter,* 552 F.2d 385, 388–89 (1st Cir.), *cert. denied,* 434 U.S. 854 (1977). The only claim before us is that the comment "by itself so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly* v. *DeChristoforo,* 416 U.S. 637, 643 (1974). Our examination of the entire proceedings convinces us that it did not.

First, we agree with the United States Supreme Court that in this type of case "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Id.* at 647. We reject the appellant's suggestion that the remark caused the jury to

infer that the omitted portions of the tapes contained evidence damaging to the accused.

Second, the prosecutor's comment was retaliatory; it therefore was within the scope of rebuttal. See V.R.Cr.P. 29.1; *State* v. *Carlson*, 133 Vt. 562, 564–65, 349 A.2d 237, 239 (1975).

■■■ The appellant bears the burden of demonstrating that the trial court abused its discretion by denying his motion for a new trial. *State* v. *Norton, supra,* 134 Vt. at 105, 353 A.2d at 327. That burden has not been met here.

During its charge to the jury, the trial court explained that the burden is on the State to establish every essential element of the offense charged, that they should keep in mind that the defendant had no burden whatsoever of going forward or producing any evidence, and that statements by counsel are not evidence in the case and were not to be considered by them in reaching a verdict. These same points were covered by counsel in closing arguments. In these circumstances we cannot say that the appellant has met his burden of affirmatively establishing prejudice.

## XIII.

The defendant's attorney filed with the trial court several requests to charge. At the conclusion of the charge and before the jury retired, see V.R.Cr.P. 30, he objected to the trial court's failure to give six of them. The appellant attempts to predicate error on five of these,[4] but they are not briefed. "Those . . . not briefed are not for consideration on this appeal." *State* v. *Brisson,* 119 Vt. 48, 51, 117 A.2d 255 (1955). Moreover, we have reviewed the charge as a whole and find that "it breathes the true spirit and doctrine of the law,

---

[4] They are (1) that the State was required to prove the presence of the accused at the scene of the crime beyond a reasonable doubt, (2) that eyewitness testimony should be carefully scrutinized, (3) that a pretrial identification by photograph must not be so suggestive as to give rise to a substantial likelihood of misidentification, (4) that an informant's testimony should be viewed with special care because of bias and interest, and (5) that a grant of immunity to a witness should be carefully weighed as to its effect on the bias and interest of a witness.

and there is no fair ground to say that the jury [was] misled by it." *State* v. *Bishop*, 128 Vt. 221, 230, 260 A.2d 393 (1969). This review also prompts us to comment further on one of the requests that was filed below.

The defendant's attorney requested an instruction on the reliability of eyewitness identification testimony (that such testimony should be carefully scrutinized) to emphasize to the jury their obligation to be satisfied of the accuracy of the identification beyond a reasonable doubt. He claims that the court's failure to give the charge was error. We disagree.

We must acknowledge the "formidable precedential authority which holds that it is necessary neither to instruct the jury that they should receive certain identification testimony with caution, nor to suggest to them the inherent unreliability of certain eye-witness identification." *United States* v. *Barber*, 442 F.2d 517, 526 (3d Cir.), *cert. denied*, 404 U.S. 958 (1971). Certainly none of our cases even so much as imply the obligation. For this reason and because we are convinced that all the facts relevant to the identification were fully developed at trial, completely covered by both sides in closing arguments, and sufficiently considered by the jury under the trial court's careful and accurate instructions on the burden of proof and the credibility of witnesses, we find no error in the court's refusal to give the instruction. See *United States* v. *Evans*, 484 F.2d 1178 (2d Cir. 1973).

But we also adopt the view expressed by the Seventh Circuit in *United States* v. *Napue*, 401 F.2d 107 (7th Cir. 1968), *cert. denied*, 393 U.S. 1024 (1969), "that some instruction (not necessarily in the form offered by the defense) on mistaken identity would have been the better practice here . . . ." *Id.* at 112. But *cf. United States* v. *Hodges*, 515 F.2d 650 (7th Cir. 1975) (requiring such an instruction).

Without doubt, conviction of the wrong man is the greatest single injustice that can arise out of our system of criminal law. The fear that a completely innocent man may be executed or sent to the penitentiary constantly haunts not only those of us concerned with the law, but sensitive people generally. Thus the obligation to guard

against this danger is obvious. An identification instruction alone will not, of course, obviate the danger. But at least it is a step in the right direction.

*Gregory* v. *United States,* 369 F.2d 185, 190 (D.C. Cir. 1966). See generally *United States* v. *Barber, supra,* 442 F.2d at 525 (adopting Pennsylvania approach set out in *Commonwealth* v. *Kloiber,* 378 Pa. 412, 424, 106 A.2d 820, 826–27, *cert. denied,* 348 U.S. 875 (1954), for use in Third Circuit) ; *United States* v. *Telfaire,* 469 F.2d 552, 558–59 (D.C. Cir. 1972) (model instruction for use in District of Columbia Circuit), followed in *United States* v. *Holley,* 502 F.2d 273 (4th Cir. 1974) and *United States* v. *Hodges, supra.*

## XIV.

The jury was not informed that the defendant was charged with being an habitual criminal until they had returned guilty verdicts on each count in Part A of the indictment. At that time a separate proceeding was conducted, and the evidence, consisting of testimony and documents, tended to establish that the defendant previously had been convicted of five felonies.[5] When the presiding judge submitted the cause to the jury he instructed them to answer an interrogatory which asked whether the defendant had been convicted of three felonies prior to the verdicts returned that day. The jury answered in the affirmative, and the trial judge sentenced the defendant "to be committed to the custody of the Commissioner of Corrections for life imprisonment on each count [in Part A.]."

 The appellant first contends that it was error for the trial judge to enhance the sentences imposed for each of his three convictions of assault and robbery. We disagree.

The statute provides:

A person who, after having been three time [sic] convicted within this state of felonies or attempts to commit felonies, or under the law of any other state, government

---

[5] The previous felony convictions were for armed robbery; uttering a forged instrument (two convictions); breaking and entering in the nighttime; and escape.

or country, of crimes which, if committed within this state, would be felonious, commits a felony other than murder within this state, may be sentenced upon conviction of such fourth or subsequent offense to imprisonment for the term of his natural life.

13 V.S.A. § 11. In our judgment, this statute does not define or create a new offense. See *Gryger* v. *Burke*, 334 U.S. 728, 732 (1948). It defines a class of individuals, fourth offenders, who are subject to an enhanced penalty when convicted of a felony, see *United States ex rel. Smith* v. *Dowd*, 271 F.2d 292, 295 (7th Cir. 1959), *cert. denied*, 362 U.S. 978 (1960), and once the status of habitual criminal is achieved the penalty for each subsequent crime is subject to such enhancement. The trial court, therefore, did not err in its interpretation of the statute.

The appellant's final argument is that the trial court imposed three *consecutive* life terms and that such a penalty violates the Eighth Amendment to the United States Constitution because it constitutes cruel and unusual punishment. He specifically relies on the proposition that the "piling up" of consecutive sentences, so that a long term results from several counts of essentially the same crime, violates the Eighth Amendment if that punishment "is grossly out of proportion to the severity of the crime." *Coker* v. *Georgia*, 433 U.S. 584, 592 (1977).

The short answer to the appellant's contention is that his life sentences are concurrent and not consecutive. We have held that the applicable statute, 13 V.S.A. § 7032, embodies the common law. *In re Sargood*, 86 Vt. 130, 83 A. 718 (1912). At common law, "when two or more sentences . . . are imposed at the same time, such sentences run concurrently unless expressly ordered otherwise." *Pelliccia* v. *Sharkey*, 110 R.I. 319, 322, 292 A.2d 862, 864 (1972). There is no order or indication in the record that these sentences were to be consecutive, and we decline to look beyond it. The issue briefed is not presented by the record.

*Affirmed.*