2008 VT 2

## State of Vermont v. Stanley Mayo

[945 A.2d 846]

No. 06-335

Present: Reiber, C.J., Dooley, Johnson and Burgess, JJ., and Zimmerman, D.J., Specially Assigned

Opinion Filed January 18, 2008

*Thomas Donovan, Jr.*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Charles S. Martin* and *Kathleen Whelley McCabe* (On the Brief) of *Martin & Associates*, Barre, for Defendant-Appellant.

¶ 1. **Burgess, J.** Defendant Stanley Mayo was convicted of aggravated assault and being a habitual offender. Defendant challenges these convictions on three grounds, claiming that the trial court erred by: (1) quashing his subpoena for recordings of telephone calls made by one of the State's witnesses from jail; (2) admitting what he describes as an unnecessarily suggestive photographic lineup, and allowing the victim to identify him in court; and (3) refusing to properly investigate allegations that the jury was tainted. Defendant further claims that the sum of the trial

court's errors entitles him to reversal on appeal. We disagree, and affirm defendant's convictions.

¶ 2. The assault at issue took place during the early morning hours of November 20, 2004. The victim was in the parking lot of the Edgewater Pub in Colchester when he was attacked by two men. One man ran at him from the direction of the bar and struck him in the face, while another man struck him from behind. The victim fell to the ground, where the two men "started kicking and punching" him. Fearing for his life, the victim moved his "arms back and forth" in front of his body to protect himself; he then went into a fetal position and soon lost consciousness. As a result of the attack, the victim sustained serious injuries, including a broken nose and broken left eye socket, lacerations to his face, and brain damage due to "air on his brain."

¶ 3. The victim's description of his assailants varied. He did not provide a description to the police immediately after the attack, but during an interview with Officer Michael Fish of the Colchester Police Department on December 17, 2004, he stated that one of his attackers had "a hat on and a goatee." He also told Officer Fish that defendant was one of the men who had attacked him. The victim maintained that he did not know defendant, but instead had been informed of defendant's involvement by an eyewitness (referred to herein as "eyewitness"), a friend of the victim who had been present at the time of the assault. Officer Fish showed the victim two photographic lineups, the first of which contained eight photos of men with light hair. All eight photos were in black and white, uniformly numbered and framed, and approximately the same size. They were shown one at a time to the victim. While the victim was not "100% sure," he chose two photographs from the eight which he thought depicted the man who had assaulted him. One of these photos was a picture of defendant. After choosing the two photographs, the victim asked the officer if he had identified defendant.

¶ 4. At a hearing on February 15, 2005, the victim described one of his assailants as not "too tall, probably 5'7". I wouldn't say muscular but fat . . . didn't look clean cut . . . [with] [l]ight facial hair." At trial, the victim described his attackers to the jury, stating that one man, who "might have been five-eight, skinny, [with] black hair" ran at him from the bar and struck him in the face, while a "fatter person, kind of grubby at the time, [with] blond hair . . . heavyset," struck the victim from behind.

¶ 5. The police also interviewed eyewitness, who was incarcerated afterwards for an unrelated incident. Eyewitness identified defendant as one of the victim's assailants. Defendant was subsequently charged with aggravated assault and violation of the habitual-offender statute on December 21, 2004.

¶ 6. Three weeks prior to trial, defendant attempted to subpoena jail records of eyewitness' telephone calls during the time he had been incarcerated following the assault, arguing that these recordings could provide valuable impeachment evidence. The Department of Corrections moved to quash the subpoena, claiming that production of the recordings would "compromise the safety and security of the Chittenden facility," and its motion was granted. Defendant also moved to suppress the introduction of the December 17 photographic lineup, as well as any subsequent in-court identification by the victim. This motion was denied. At trial, defendant was convicted of both counts, and this appeal followed.

### I. Defendant's subpoena for recordings of eyewitness' telephone calls

¶ 7. Defendant first contends that the trial court erred when it quashed his subpoena for the recordings of eyewitness' telephone calls from jail. Defendant claims that the trial court's actions violated his rights under the Confrontation Clause of the Sixth Amendment of the United States Constitution, Chapter I, Article 10 of the Vermont Constitution, the Due Process Clause of the Fourteenth Amendment of the United States Constitution, and Rule 16 of the Vermont Rules of Criminal Procedure.

¶ 8. We first address defendant's claim of a Confrontation Clause violation, and conclude the Confrontation Clause affords no protection to defendant in the context of a pretrial motion for discovery. This Court discussed the reach of the Sixth Amendment to the pretrial context in *State v. Percy*, 149 Vt. 623, 548 A.2d 408 (1988). In *Percy*, we upheld the trial court's denial of the defendant's request to have a psychological expert examine the victim before trial with the aim of preparing his experts to testify before the jury. *Id.* at 631-32, 548 A.2d at 412-13. Because the Sixth Amendment right of confrontation is a "trial right that is not violated by restrictions on pretrial discovery," we conclude that the defendant had no Sixth Amendment right at stake during

the pretrial discovery stage of trial. *Id.* at 633, 548 A.2d at 414. Similarly, defendant's claim here, raised in the context of a pretrial subpoena of a witness' telephone records, must fail.

¶ 9. Defendant is not without recourse for denial of pretrial discovery. While rejecting the application of the Sixth Amendment to pretrial discovery in *Percy*, we explained that the Due Process Clause of the Fourteenth Amendment establishes "disclosure rights relevant to defendant's [pretrial] claims." *Id.* at 633-34, 548 A.2d at 414.[1] Defendant must pursue this due-process claim before the trial court, however, and in the instant case, this claim was not raised until defendant's motion for discovery pending appeal, filed more than a year after the October 2005 trial. Because defendant failed to raise this claim below, we review only for plain error. *State v. Wiley*, 2007 VT 13, ¶ 7, 181 Vt. 300, 917 A.2d 501. "Plain error exists only in exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." *State v. Carpenter*, 170 Vt. 371, 375, 749 A.2d 1137, 1139-40 (2000) (quotation omitted).

¶ 10. No such miscarriage of justice occurred here. In the motion hearing before the court, defendant argued that he should be able to listen to recordings of the calls eyewitness made while in prison because eyewitness was a key witness in the case. Defendant offered no specific evidence as to the contents of the particular conversations requested, nor any indication why the evidence he sought would be found in the telephone records. Rather, he claimed that he should have the opportunity to see "whether or not [eyewitness] made incriminating statements to the people on the outside," because eyewitness had, in the past, made inconsistent statements regarding the case. The trial court denied defendant's request for an in-camera hearing, finding that defendant, "not having the slightest idea of the content of these conversations," had made an insufficient showing that these conversations contained material evidence. The court did, however, allow defendant another chance to prove the conversations were material: it ordered the Department of Corrections to release a

---

[1] As the constitutional obligation to disclose under the Due Process Clause is "identical" to that required by V.R.Cr.P. 16, a separate analysis of that rule is unnecessary here. *State v. Lewis*, 151 Vt. 38, 40, 556 A.2d 59, 61 (1988).

call log containing a full listing of the telephone calls eyewitness had made while in jail, including the names and telephone numbers of the persons called, and instructed defendant to telephone the individuals listed on the log to determine whether those individuals had in fact discussed the case with eyewitness while he was incarcerated. The court suggested that the issue could be revisited if it appeared that the telephone conversations did contain specific information about the case. Defendant did not follow up on this information for more than a year after trial. Given the lack of evidence presented by defendant that the particular recordings he was requesting would provide material evidence, and the opportunity provided by the trial court for defendant to gather the information needed through call logs, we find no plain error here.

## II. The photographic lineup and subsequent in-court identification

¶ 11. Defendant next raises three contentions regarding the admission of the photographic lineup and the victim's in-court identification of him at trial: (1) the trial court erroneously found that the victim could not have identified defendant at the time of the photographic lineup; (2) based on these findings, the trial court improperly found that the lineup was not unnecessarily suggestive; and (3) the trial court improperly admitted the in-court identification as evidence at trial. We review these three claims in turn.

¶ 12. "Upon appeal of a motion to suppress, this Court applies a deferential standard of review to the trial court's findings of fact. . . . Legal conclusions are reviewed de novo." *State v. Williams*, 2007 VT 85, ¶ 2, 182 Vt. 578, 933 A.2d 239 (mem.) (citations omitted). We will overturn the factual findings of the trial court only if, "taking the evidence in the light most favorable to the prevailing party, and excluding the effect of modifying evidence, there is no reasonable or credible evidence to support them." *State v. Nault*, 2006 VT 42, ¶ 7, 180 Vt. 567, 908 A.2d 408 (mem.) (quotations omitted).

¶ 13. Here, the trial court found that the victim had not met defendant in twenty years, and "would not have been able to identify him by name, had he seen him." The court further found that the victim did not know that one of the photos he had chosen in the lineup from December 17, 2004 depicted defendant. When

making these findings, the court acknowledged that, while the victim's testimony had been "confusing and contradictory at times," he indeed was able to see his assailant during the attack, and offer a description of him.

¶ 14. We see no error in these findings. Although we acknowledge the murky nature of the victim's testimony regarding his past interactions with defendant, "[t]he credibility of witnesses, weight of the evidence and its persuasive effect are matters for the exclusive determination of the trier of fact. The ruling of the court must stand if supported by credible evidence, even though there may be inconsistencies or substantial evidence to the contrary." *State v. Tribble*, 2005 VT 132, ¶ 12, 179 Vt. 235, 892 A.2d 232 (quotations omitted). Under this deferential standard, sufficient evidence was presented to support the trial court's ultimate finding that the victim could not have identified the defendant by name at the time of the lineup on December 17, 2004.

¶ 15. At the hearing on February 15, 2005, the victim testified that he had never put defendant's "name to the face" until this "incident" took place. He stated that, although he knew of defendant's group of friends and had seen them around town during the summer of 2004, he could not have identified defendant among them. Although the victim initially presented differing and somewhat sparse details regarding the physical description of his assailants prior to being shown the lineup, there was testimony that he had trouble recalling the incident due to his injuries and had misunderstood the inquiries of the police at the time. At the hearing on February 15, the victim stated that he had seen defendant clearly during the attack. He further testified that he picked defendant out of the lineup because he recognized him as one of the men who assaulted him — not because he was aiming to pick out "Stanley Mayo" after being told by eyewitness that defendant had been involved in the attack. His inquiry to Officer Fish after the lineup — "Did I pick out Stanley Mayo?" — further supports the trial court's finding that the victim was not able to identify defendant by name at the time of the lineup. Based on this testimony, the trial court was within its discretion to find that the victim could not have identified the photo of defendant as "Stanley Mayo" at the time of the lineup.

¶ 16. Defendant next argues that the trial court improperly failed to suppress the introduction of the lineup in violation of the Due Process Clause of the Fourteenth Amendment. We apply a two-part inquiry to determine the admissibility of pretrial identifications, first asking if the identification was unnecessarily suggestive, and, if so, then assessing its reliability. Even if the lineup is found to be unnecessarily suggestive, it may still be admissible if it bears sufficient indicia of reliability. *State v. Emerson*, 149 Vt. 171, 174, 541 A.2d 466, 468 (1987) ("Before defendant's conviction can be reversed on grounds of an invalid pretrial identification procedure, the procedure must be shown to have been so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.") (quotations omitted); *State v. Kasper*, 137 Vt. 184, 192-93, 404 A.2d 85, 90 (1979). We review the trial court's legal conclusions on a motion to suppress de novo. *State v. Chapman*, 173 Vt. 400, 402, 800 A.2d 446, 448 (2002).

¶ 17. To determine whether a pretrial identification involved unnecessary suggestivity, we look to the totality of the circumstances. *State v. Bissonette*, 145 Vt. 381, 385, 488 A.2d 1231, 1233 (1985). First, we must determine if the lineup was suggestive, concentrating on form, such as how the lineup was set up, how many photos were arrayed, whether the photos were similar in size, color, or description, and the officer's administration of the lineup. We have flagged several practices as suggestive, including the display of multiple photos of a defendant within one photo array, *Kasper*, 137 Vt. at 192, 404 A.2d at 90, and a presentation consisting solely of one photo of the defendant, *State v. Findlay*, 171 Vt. 594, 597, 765 A.2d 483, 487 (2000) (mem.).

¶ 18. Applying the initial analytical framework here, we do not find this pretrial identification to be suggestive. The lineup at issue consisted of eight photographs, all of men with "round faces, stocky builds, fair complexions, light hair, and in their late twenties to early forties." Officer Fish, who administered the lineup, handed each of the eight photos to the victim sequentially, telling him that he should examine them and choose his assailant. The victim was told that the officer could not answer any questions during the process. The victim examined the photos and selected two who resembled the person who had assaulted him. The officer's procedure was no more leading than lineup practices we have previously approved of as nonsuggestive, including a

lineup displaying twenty-seven photos sequentially, rather than in an array, *Bissonette*, 145 Vt. at 386, 488 A.2d at 1234; an array of black-and-white photos, *Emerson*, 149 Vt. at 174, 541 A.2d at 468; and a lineup displaying five photos with only the defendant smiling and displaying his teeth, when a description of the defendant's teeth was one of the identifying factors provided by the witness, *State v. Leavitt*, 133 Vt. 35, 38-39, 329 A.2d 627, 628-29 (1974). Because we find that the officer's photo-array procedure was not suggestive, we need not reach the questions of necessity or irreparable misidentification.

¶ 19. Defendant argues that the victim's testimony demonstrated that he did, in fact, know who defendant was before the lineup, and that the victim had not given a sufficient description of his attacker before he was shown the photo lineup. While such facts, if believed, might go to the weight the jury would accord the lineup, they have no bearing on our inquiry under the Fourteenth Amendment, which is to ascertain if the lineup was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Emerson*, 149 Vt. at 174, 541 A.2d at 468 (citation and quotation omitted). As stated by the United States Supreme Court, "evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).

¶ 20. We also reject defendant's claim that the victim's in-court identification was erroneously allowed at trial. We have held that "reliability is the linchpin in determining the admissibility of identification testimony," *Kasper*, 137 Vt. at 192, 404 A.2d at 90 (quotations omitted), weighing numerous factors to assess reliability, including "the opportunity of the witness to observe the criminal at the time of the crime, the witness' degree of attention, the accuracy of the description he is able to give police, the level of certainty accompanying the description, and the time lapse between the crime and when the description is first given." *State v. Savo*, 141 Vt. 203, 212, 446 A.2d 786, 791 (1982). Again, such testimony is excluded only if there is "a very substantial likelihood of irreparable misidentification." *Kasper*, 137 Vt. at 192, 404 A.2d at 90 (quotations omitted). We will overturn the trial court's ruling only if it is an abuse of discretion. *Savo*, 141 Vt. at 208, 446 A.2d at 789.

¶ 21. Here the court was within its discretion in admitting the victim's in-court identification of defendant. Although the assault lasted but minutes, Mr. Gonyo testified that he observed defendant with "perfect vision" as he was "bent over on top of" Mr. Gonyo, "punching [him] smack da[b] in the face." Mr. Gonyo gave descriptions of his attackers to the police a month after the attack, when interviewed at the station, and also at a hearing on February 15, 2005, less than three months after the incident occurred. While not "100% sure," he was able to narrow the eight-man photo array presented to him down to two photographs, one of which depicted defendant. Given these factors, we cannot say that admitting his in-court testimony created a substantial risk of "irreparable misidentification," and thus decline to find that the trial court abused its discretion in allowing the in-court identification.

### III. The trial court's denial of defendant's request for a hearing or in-camera interview of an allegedly biased juror

¶ 22. Defendant next claims that the trial court abused its discretion by refusing to hold an in-camera hearing to investigate his allegations that a juror lied during voir dire and later brought extraneous evidence to jury deliberations. Defendant raised this claim for the first time in his motion for new trial.

¶ 23. Defendant is entitled to a new trial if he can show juror partiality or the presence of extraneous information that corrupted the jury's deliberations. To show juror partiality, defendant "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). To prove that extraneous information has corrupted the jury, defendant must show that "an irregularity . . . creating . . . suspicion of extraneous influences" with the "capacity to influence jury deliberations" has occurred. *State v. Schwanda*, 146 Vt. 230, 232, 499 A.2d 779, 781 (1985) (quotation omitted).

¶ 24. Defendant here claimed that a juror failed to answer honestly during voir dire when he denied that he knew defendant. Because others said that the juror did know defendant, defendant argues, the juror could have disclosed information about defend-

ant's past conduct to the jury, thus corrupting their deliberative process. In support thereof, defendant submitted five affidavits — from himself and four acquaintances — all of which allege that the juror must have known defendant in the past.[2] The State responded by submitting an affidavit from the juror refuting these claims, stating directly that he "did not, and do[es] not, know [defendant]."

¶ 25. The court declined to hold an evidentiary hearing on these claims, and denied defendant's motion for new trial for two reasons: he failed to make the requisite showing for challenging juror misconduct as required in *McDonough*, and, in any case, he waived his objection by failing to bring it to the court's attention before the jury was empaneled. We review the trial court's decision for abuse of discretion. *State v. Gorbea*, 169 Vt. 57, 60, 726 A.2d 68, 70 (1999).

¶ 26. Here, the trial court was within its discretion to decide that no evidentiary hearing was needed. Viewing defendant's proffer in the light most favorable to defendant, his affidavits provided at best speculative or merely conclusory claims of the juror's knowledge, and thus did not demonstrate that the juror "failed to answer honestly a material question on *voir dire*." *McDonough*, 464 U.S. at 556. While defendant demanded a hearing and cited a number of cases where courts have held evidentiary hearings in order to decide claims of juror misconduct, he gave no reason why such a hearing would be helpful or provide any additional information beyond the speculation contained in his affidavits.

¶ 27. Defendant's juror-bias and corruption claims were, in any event, waived due to the fact that defendant failed to raise them until his motion for a new trial. By statute and through case law, Vermont generally bars challenges to the composition of the jury after that jury has been empaneled. In *In re Nash* we held

[2] These affidavits recite generalized claims, rather than specific, fact-based examples as to the juror's supposed knowledge of defendant. The affiants lived in the same neighborhood where the juror grew up and attested, variously, that the juror and defendant had grown up in the same neighborhood in Burlington, "there isn't any way that [the juror] doesn't know [defendant]," the juror "h[u]ng out with some of the same people [defendant] hung around with," and that "[t]here is no DOU[B]T in my mind what so ever that [the juror] PERSONALLY KNOWS [defendant].

that the "right to challenge a juror is waived by a failure to object before the jury is [e]mpaneled if the basis for the objection is known or might, with reasonable diligence, have been discovered during voir dire." 158 Vt. 458, 467, 614 A.2d 367, 372 (1991). Vermont Rule of Criminal Procedure 24(b) similarly requires that challenges for cause be made prior to the empanelment of the jury.

¶ 28. Here, defendant stated that "[a]t the time that the jury was being selected I thought that I might have known [the juror]." Even though defendant "indicated this" to his attorney at that time, no action was taken during voir dire to further this inquiry. Despite the fact that defendant had additional time to confer with his attorney after voir dire, while exercising his peremptory challenges, and following the jury selection process — the jury was selected eight days before the commencement of trial — he let the matter drop until the filing of his motion for a new trial. Under the *Nash* standard, because defendant knew there was a potential problem with the juror during voir dire, but failed to properly pursue this challenge, he waived his right to assert the claim.

¶ 29. Because we find no error in the trial court's rulings, we also dismiss defendant's claim that the trial court's errors collectively were sufficiently prejudicial to warrant reversal.

*Affirmed.*