NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 4

No. 22-AP-275

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Franklin Unit, |
| | Criminal Division |
| | |
| Jason M. Bockus | October Term, 2023 |

Martin A. Maley, J.

Evan Meenan, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Dawn Seibert and Dawn Matthews, Appellate
  Defenders, Montpelier, for Defendant-Appellant.


PRESENT:  Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.


¶ 1.    **CARROLL, J.**   Defendant Jason Bockus appeals a judgment of conviction for assault and robbery following a jury trial.  He contends that the trial court erred in not suppressing out-of-court noneyewitness identifications and denying his motion for judgment of acquittal.  Defendant also argues that the court impermissibly punished him with a harsher sentence for exercising his right to go to trial.  We affirm.

## I.  Background

¶ 2.    The following is adduced from testimony and exhibits admitted at trial, and from facts found by the trial court in its order denying defendant's motion to suppress out-of-court identifications.  In early December 2020, a man entered an Irving service station in Highgate,

Vermont just before 11 p.m.  Multiple surveillance cameras showed the man wearing a hoodie, beanie, and mask that obscured most, but not all of, his face.  The man told the two service-station employees on duty that he had a gun and ordered them to open the cash drawer.  One of the attendants opened the drawer.  The man took $190 and left.  Neither attendant could identify the man.

¶ 3.    Vermont State Police Detective Sergeant Baker led the investigation into the robbery.  She posted stills of the suspect taken from the surveillance footage to the Vermont State Police Facebook page.  A local resident, Christopher Uzell, responded to the posting and told Detective Baker that defendant resembled the suspect.  He informed Detective Baker that he had known defendant for about twenty years and recognized defendant's distinctive eyes.  In addition to using the surveillance footage to obtain further positive identifications from defendant's probation officer, Greg Machia, and the manager of a sober house where defendant had once lived, Harley LaRocque, Detective Baker questioned several members of defendant's family to confirm the identity of the perpetrator.

¶ 4.    Detective Baker interviewed each family member individually and used the same procedure with each person.  She told them that she was investigating the robbery at the Irving station in Highgate and asked to show them surveillance footage and stills of the footage to see if they recognized the perpetrator.  Detective Baker first played surveillance footage, then showed stills from the footage, and then, following the person's identification of defendant, showed a mugshot and a Facebook photograph from defendant's personal account to confirm that they were talking about the same person.  She did not tell them that she suspected defendant of committing the crime depicted in the presentation materials, and she provided no commentary while they watched the footage.[1]  Ultimately, defendant's brother and sister-in-law, TJ and Chantell Bockus,

---

[1] There was no audio recording of the incident.

defendant's ex-girlfriend and mother of his child, Brittany Blaisdell, and Blaisdell's mother, Deena Raymond, all identified defendant as the suspect. Each person expressed their belief that defendant was the perpetrator because the person in the video had defendant's same distinctive body movements and unique eyes, among other characteristics. Some family members informed one another that they believed defendant "might" be the person depicted in the footage prior to Detective Baker's questioning. For various reasons, each family member expressed fear that defendant could retaliate if he learned that they had identified him, and frustration with "the system" in which defendant had been involved for years.

¶ 5. Based on the above, the State charged defendant with one count of assault and robbery with a deadly weapon, 13 V.S.A. § 608(b), and with being a habitual offender with three prior felony convictions, 13 V.S.A. § 11, which carried the possibility of life imprisonment.

¶ 6. Defendant moved to suppress the out-of-court identifications made by Chantell and TJ Bockus, Brittany Blaisdell, and Deena Raymond under Article 10 of the Vermont Constitution. He contended that Detective Baker had used an unduly suggestive comparison lineup to obtain the identifications, and because the noneyewitnesses knew others had already identified defendant before viewing the presentation themselves, their own identifications were tainted by confirmation bias. Following an evidentiary hearing, the trial court denied the motion, finding that Detective Baker had not used unnecessarily suggestive investigation techniques, that suggestive circumstances not created by law enforcement are "irrelevant" under State v. Porter, 2014 VT 89, 197 Vt. 330, 103 A.3d 916, and that even if the circumstances were suggestive, the identifications were reliable.

¶ 7. At trial, Uzell, Machia, LaRocque, the Bockuses, and Blaisdell testified for the State. Uzell testified that he was eighty-percent sure of his identification, Machia said that he was more than "ninety-nine-point nine percent sure," and LaRocque averred that he was a "seven or eight" on a scale of one to ten about his identification. Chantell and TJ Bockus, and Brittany

3

Blaisdell each testified that they were convinced that defendant was the perpetrator. The State also called Lynn Knight, with whom defendant had been living at the time of the robbery. Knight testified that she was initially seventy-five percent sure that defendant was the perpetrator, but later disclaimed her identification.

¶ 8. At the close of the State's case-in-chief, defendant moved for judgment of acquittal. Defendant argued that the State had failed to proffer sufficient evidence proving beyond a reasonable doubt that he was the robber because it relied exclusively on out-of-court identifications by noneyewitnesses, many of whom harbored biases and "agendas" against defendant. He also contended that the State failed to prove that the perpetrator had been carrying a deadly weapon during the robbery. Taking all evidence in the light most favorable to the State, and excluding modifying evidence, the court found that the State's witnesses had credibly testified that defendant was the suspect in the surveillance footage, and the service-station employees had credibly testified that it appeared to them that the man had been carrying a handgun.

¶ 9. At the close of evidence, the court instructed the jury on the elements of assault and robbery with a deadly weapon as follows:

> (1) [defendant]; (2) [a]ttempted to put . . . gas station store clerks . . . in fear of imminent serious bodily injury; (3) [h]e did so by using physical menace; (4) [h]e also took money or other property . . . (5) [h]e took the money or other property with the intent to deprive [the gas station] of it permanently; and (6) [a]t the time, he was armed with a dangerous weapon.

The court clarified that: "physical menace means a threat by word or act to inflict physical injury upon another person" and that "the State alleges that Mr. Bockus attempted by physical menace to place [the service-station employees] in fear of imminent serious bodily injury, by showing them the weapon concealed in his waistband." The State requested an instruction on the lesser-included charge of assault and robbery. Without objection, the court instructed the jury that the first five elements of assault and robbery were "defined in the same way as they are defined for assault and

4

robbery with a deadly weapon," except that "[t]he State need not have proven that Mr. Bockus[] was armed with a dangerous weapon at the time."

¶ 10. The jury found defendant not guilty of assault and robbery with a deadly weapon. It found him guilty of the lesser-included charge of assault and robbery, and of being a habitual offender. At sentencing, the State recommended ten-to-twenty-five-years to serve. Defendant requested a sentence of two-and-a-half-to-five-years to serve. The court ultimately sentenced defendant ten-to-fifteen-years to serve, opining:

> So even though the weight of the evidence was perhaps not overwhelming, it was compelling, and the jurors certainly found that it was. And while the Court can't comment on someone's willingness and ability and right to go to trial, the fact is that folks who enter pleas prior to trial tend to get a better result because they've accepted responsibility. And Mr. Bockus certainly has not accepted responsibility, which leads the Court to believe that the programming part of this, to the extent that it exists, is probably not going to be helpful for him because he's not at that point. I don't even think he's, what they call, pre-contemplative at this point in regards to his willingness to make changes in his life.

This appeal followed.

¶ 11. Defendant advances several arguments on appeal. He argues that the court erred in not suppressing the identifications made by Chantell and TJ Bockus, Brittany Blaisdell, and Deena Raymond because Detective Baker used unnecessarily suggestive means to obtain the identifications. Specifically, he contends that Detective Baker's decision to interview "estranged family members" was unnecessarily suggestive, as was her failure to ask the witnesses not to discuss their own identifications with each other. He argues that the identifications are also unreliable and should have been suppressed. Defendant asserts that the court improperly relied on State v. Porter for the proposition that suggestibility is irrelevant where the challenged circumstances are not arranged by law enforcement. Defendant further contends that the court erred by denying his motion for judgment of acquittal and deprived him of due process by imposing an impermissibly harsh sentence because he exercised his right to trial.

5

¶ 12. We hold that the court did not err in denying defendant's motion to suppress. We agree with the trial court that the identifications of defendant were not made under unduly suggestive circumstances. Accordingly, we do not reach the question of whether the identifications were reliable for purposes of defendant's due process rights, nor do we decide whether we review purportedly suggestive out-of-court identifications not arranged by police under Article 10. We affirm the trial court's ruling on defendant's motion for judgment of acquittal and detect no vindictiveness toward defendant from the trial court that would justify disturbing the sentence it imposed.

## II. Out-of-Court Noneyewitness Identifications

¶ 13. We turn first to the question of whether the trial court should have suppressed the identifications of defendant made by Chantell and TJ Bockus, Brittany Blaisdell, and Deena Raymond. We review a trial court's legal conclusions in an order denying a motion to suppress without deference and defer to its factual findings absent clear error. State v. Discola, 2018 VT 7, ¶ 26, 207 Vt. 216, 184 A.3d 1177.

¶ 14. The Vermont Constitution provides that criminal defendants shall have the right "to be confronted with the witnesses" against them. Vt. Const. ch. I, art. 10. The Court applies the two-part test first set forth in Manson v. Brathwaite, 432 U.S. 98 (1977), to determine whether an out-of-court identification procedure violates that right. Porter, 2014 VT 89, ¶ 20, overruled on other grounds by Discola, 2018 VT 7, ¶ 30. We first consider the circumstances surrounding the identification to determine whether they were unnecessarily suggestive. State v. Kasper, 137 Vt. 184, 192, 404 A.2d 85, 90 (1979), overruled on other grounds by Discola, 2018 VT 7, ¶ 30. The touchstone of this inquiry is whether the method was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." State v. Mayo, 2008 VT 2, ¶ 18, 183 Vt. 113, 945 A.2d 846 (quotation omitted). Second, even "[i]f suggestive, the identification is still admissible if certain indicia of reliability outweigh the corrupting effect of the suggestive

6

identification." Discola, 2018 VT 7, ¶ 27 (quotation omitted) (describing factors used to evaluate reliability).

¶ 15.   In determining whether an out-of-court identification was obtained under unnecessarily suggestive circumstances, in addition to considering the totality of the circumstances, we concentrate on the form of the presentation used by police. Mayo, 2008 VT 2, ¶ 17.  Factors we have considered include "how the lineup was set up, how many photos were arrayed, whether the photos were similar in size, color, or description, and the officer's administration of the lineup." Id.  This case presents the first time we have considered whether police identification practices involving noneyewitnesses to a crime are unduly suggestive.

¶ 16.   The trial court found that each person spontaneously identified defendant only after watching the surveillance footage without commentary from Detective Baker.  Detective Baker did not disclose defendant's name until after each person made a positive identification, at which point she produced a photo of defendant to ensure that they were speaking about the same person. We conclude that this procedure was not unduly suggestive.  The form of Detective Baker's presentation is not like our prior cases involving suggestive methods where an eyewitness was shown a display of multiple photos of the defendant in a single array, Kasper, 137 Vt. at 192, 404 A.2d at 90, a presentation consisting solely of one photo of the defendant was shown to an eyewitness, State v. Findlay, 171 Vt. 594, 597, 765 A.2d 483, 487 (2000) (mem.), or an in-court identification of a defendant was made by two eyewitnesses who had seen a photograph of the defendant shortly before the hearing and who was dressed in a prisoner's uniform and bound in shackles.  Discola, 2018 VT 7, ¶ 28.  In contrast to the identification procedures used in those cases, Detective Baker did not show unmasked depictions of defendant until after each noneyewitness viewed the surveillance footage and identified defendant of their own accord.  See State v. Bissonette, 145 Vt. 381, 386-87, 488 A.2d 1231, 1234 (1985) (holding procedure not

suggestive where police showed eyewitness twenty-seven photographs one-by-one and made no suggestions "emphasizing one photograph over another").

¶ 17. Moreover, because neither of the store employees could identify the perpetrator, it was reasonable for Detective Baker to seek out family members who might be in a position to identify him. See Commonwealth v. Vasquez, 130 N.E.3d 174, 186 (Mass. 2019) (holding that police had "good reason" to have victim's family members attempt to identify person in surveillance footage where no eyewitnesses could do so). The totality of the circumstances in this case—including the nature of the surveillance footage, the tip Detective Baker received about the possible identity of the perpetrator, her choice to ask family members of defendant to identify the perpetrator via surveillance footage to confirm the tip, and the method she used to obtain the identifications—does not give rise to the danger of "irreparable mistaken identification." Bissonette, 145 Vt. at 385, 488 A.2d at 1233.

¶ 18. The Massachusetts Supreme Judicial Court reached the same conclusion on similar facts in Commonwealth v. Vasquez. There, surveillance cameras recorded audio and visual depictions of a man shooting and killing a woman in a parked car. There were no "percipient" eyewitnesses to the shooting. 130 N.E.3d at 186. Police questioned members of the victim's family who, before arriving at the police station, had spoken to one another and surmised that the victim had been involved in a shooting and that the defendant was the likely perpetrator. Interviewing the witnesses separately, police presented each witness, in order, a photograph of the defendant, an audio recording of the incident, and surveillance footage. Police did not suggest the defendant's involvement and provided no "confirmatory feedback" to the witnesses. Id. at 185 n.16. The Massachusetts high court reasoned that the form of the presentation was not unnecessarily suggestive because, without eyewitnesses who could identify the perpetrator, police had good reason to believe that the victim's family members were in a position to identify the

8

shooter from the surveillance footage, police presented the identification materials separately, and they did not include the audio or visual depiction of the gunshot.[2] Id. at 186.

¶ 19. We are also unpersuaded by defendant's argument that Detective Baker's failure to ask the witnesses to not speak with one another amounted to undue suggestiveness. The court found Detective Baker's testimony credible regarding the identification procedure she used and found the witnesses' testimony credible regarding their own identifications. The court found that each credibly "testified that they independently identified [defendant] based off the video surveillance footage," and that any biases and knowledge that others had already identified defendant "had minimal influence" on their own identifications.[3] Based on the court's findings, we conclude that the challenged identifications were not tainted by confirmation bias or animosity toward defendant, and therefore were not spoiled by undue suggestiveness. Mayo, 2008 VT 2, ¶ 14 (deferring to trial court to determine weight of evidence and its persuasive effect, witness credibility, and noting that trial court's rulings will be affirmed if supported by law).

¶ 20. We concur, however, with the Massachusetts high court that "it was not ideal that, prior to making an identification, each witness was apparently aware that the victim had been killed and suspected the defendant's involvement." Vasquez, 130 N.E.3d at 185 n.16. And we agree that, where feasible to do so, police should direct witnesses not to speak about their perceptions with other witnesses prior to the identification proceedings. See id. Law enforcement "cannot be expected to prevent every conceivable exposure to external information," but should "guard against the risk that a witness may be influenced by his or her conversations with . . . family members . . . before making an identification." Id.

---

[2] We note that police in Vazquez showed each witness a photograph of the defendant before playing the audio and visual recordings, which was not done here.

[3] While these findings appear in the court's reliability analysis, they clearly apply to Detective Baker's methodology, which the court itself noted.

¶ 21. While not ideal, the mere fact that the witnesses, prior to their own identifications, were aware that others had potentially identified defendant in the surveillance footage does not alone render the identifications suggestive. We emphasize that each case involving out-of-court identifications is dependent on its own unique circumstances, and our holding is accordingly narrow. Discola, 2018 VT 7, ¶ 27 (explaining that courts must examine circumstances surrounding identification procedure). Because the circumstances surrounding the identifications in this case were not unduly suggestive, we need not reach the question of reliability. See Mayo, ¶¶ 16-19 (explaining that where challenged procedure was not suggestive, Court need not proceed to step two of Brathwaite test to screen for reliability because procedure does not "give rise to a very substantial likelihood of irreparable misidentification" (quotation omitted)).

¶ 22. Defendant next takes issue with the trial court's conclusion that where police do not arrange the suggestive circumstances, under State v. Porter, 2014 VT 89, Article 10 does not apply to out-of-court identifications. Defendant spends considerable time in his briefing asking the Court not to extend the U.S. Supreme Court case cited in Porter, Perry v. New Hampshire, 565 U.S. 228 (2012), to the Vermont Constitution.[4] He argues that we should instead hold that due process protections attach to all suggestive identifications, involving police or not, and that the Supreme Judicial Court of Massachusetts follows this approach. We do not decide defendant's constitutional claim because, as discussed above, we affirm the trial court's denial of the suppression motion on an alternative basis, namely, that there were no suggestive identifications to begin with.[5] See State v. Bauder, 2007 VT 16, ¶ 27, 181 Vt. 392, 924 A.2d 38 ("It is . . .a

---

[4] In Perry, the U.S. Supreme Court held that, because the reliability screening function in Brathwaite test is designed to deter police misconduct, where suggestive identifications are not arranged by police, courts do not need to screen for reliability. 565 U.S. at 241-42.

[5] Defendant's citations to State v. Porter for the proposition that courts will limit or suppress suggestive identification testimony is to the portion of the opinion reviewing the defendant's preserved Vermont Rule of Evidence 403 claim, not his due process claim. See, e.g., 2014 VT 89, ¶¶ 24-26; cf. Commonwealth v. Johnson, 45 N.E.3d 83, 88-90 (Mass. 2016)

fundamental tenet of judicial restraint that courts will not address constitutional claims . . . when adequate lesser grounds are available.").

## III. Judgment of Acquittal

¶ 23. Defendant argues that the court erred when it denied his motion for judgment of acquittal. In effect, defendant contends that noneyewitnesses are insufficient to prove the identity element where there is no physical evidence linking a defendant to a crime. He also argues that, as instructed, the jury could not have found defendant guilty of the lesser-included charge because the State did not put on sufficient evidence to prove that defendant used physical menace to commit the crime.

¶ 24. We review a denial of a motion for judgment of acquittal without deference to the trial court. State v. Durenleau, 163 Vt. 8, 10, 652 A.2d 981, 982 (1994). We must "determine whether the evidence presented by the State, taken in the light most favorable to the prosecution and excluding any modifying evidence, sufficiently and fairly supports a finding of guilt beyond a reasonable doubt." Id.

¶ 25. At trial, the State put on three nonfamily members—Uzell, Machia, and LaRocque—who testified that they were somewhere between seventy-percent sure and ninety-nine percent sure of defendant's identity based on the surveillance footage. Uzell and Machia testified that they had known defendant for decades, and LaRocque had managed the group home where defendant lived in the months before the robbery. Chantell Bockus, TJ Bockus, and Brittany Blaisdell each testified that they were convinced defendant was the perpetrator and identified him in court. Though the Bockuses had not seen defendant in person since 2012, each testified that the

(explaining that Massachusetts reviews suggestive out-of-court noneyewitness identifications not arranged by law enforcement under its "common law principles of fairness," including evidentiary rule 403) Defendant has not preserved a Rule 403 claim here, nor does he explain on appeal how it would have led to a different result than the reliability analysis in the Brathwaite test if he had raised it below. State v. Stanislaw, 153 Vt. 517, 528, 573 A.2d 286, 293 (1990) (explaining that arguments not presented in proceedings below with sufficient particularity are waived).

perpetrator's distinctive body movements and unique eyes were immediately recognizable. Brittany Blaisdell testified that she had been in a three-and-a-half-year relationship with defendant eight years prior, that she could identify defendant because of the distinctive way he carried himself, and that she recognized his eyes because they were "very distinctive. Our daughter has his eyes, so I see them all the time." This testimony, along with the surveillance videos admitted into evidence, fairly and sufficiently supports a finding of guilt beyond a reasonable doubt on the identity element.

¶ 26. Defendant next contends that the State proffered insufficient evidence to convict him of the physical-menace element on the lesser-included charge. He asserts that the court's instruction on the physical-menace element—that defendant "attempted by physical menace to place [the service-station employees] in fear of imminent serious bodily injury, by showing them the weapon concealed in his waistband"—is insufficient without further clarity to sustain a guilty verdict without a finding that defendant was armed with a deadly weapon at the time of the robbery.

¶ 27. We conclude that the instruction was accurate and consistent such that the jury could acquit on assault and robbery with a deadly weapon, 13 V.S.A. § 608(b), but nonetheless find defendant guilty on the lesser-included charge of assault and robbery. The employees testified that defendant lifted up his shirt and/or "moved his jacket" to show what they took to be "the butt of a gun" or the handle of a gun, and that they were afraid. Based on this testimony, the State proffered sufficient evidence to prove that defendant "attempted by physical menace to place [the service-station employees] in fear of imminent serious bodily injury, by showing them the weapon concealed in his waistband." While possessing a dangerous weapon is an essential element to convict under § 608(b), the jury could find that defendant did not possess a "real gun capable of bodily injury," but "that defendant displayed what appeared to be a real gun which placed the complainant in fear of serious bodily injury." State v. Stone, No. 2010-346, 2011 WL 4984009, at *1 (Vt. June 1, 2011) (unpub. mem.) [https://perma.cc/PC3D-4ERG]. The employees testified

12

that defendant "showed" them what they understood to be a gun, that it appeared to be partially concealed in his waistband, and that they were afraid he would "pull it on" them. The State, as defense counsel agreed, did not need to prove that defendant was actually armed with a dangerous weapon at the time he robbed the service station to prevail on the lesser-included charge. Defendant has failed to demonstrate error here.

## IV. Vindictive Sentencing

¶ 28. Defendant's final contention is that the court improperly punished him with a harsher sentence because he maintained his innocence and exercised his right to trial rather than plead prior to trial. This argument is without merit.

¶ 29. Punishing a defendant for exercising their right to trial "is a due process violation of the most basic sort." State v. Hughs, 2018 VT 74, ¶ 12, 208 Vt. 44, 194 A.3d 1181 (quotation omitted). "This principle is so fundamental to our legal system that even the perception—if not the actuality of its abrogation should be avoided to prevent lasting damage to the public's perception of the inherent fairness of the criminal justice system." Id. (quotation omitted).

¶ 30. When faced with an allegation of a vindictive sentence, we review the totality of the record to determine whether to disturb the trial court's ruling. Id. ¶ 14. In doing so, we compare the imposed sentence with both the statutory maximum and the sentence recommended by the State, determine whether the "vast majority of the trial court's sentencing remarks focused on legitimate sentencing considerations," and consider the context of the challenged comments. Id. ¶¶ 16-17 (quotation omitted). Ultimately, we will affirm a sentence "[a]bsent exceptional circumstances, [and] defer to the court's judgment so long as the sentence is within the statutory limits and was not based on improper or inaccurate information." State v. Lumumba, 2014 VT 85, ¶ 22, 197 Vt. 315, 104 A.3d 627 (quotation omitted).

¶ 31. Under the first factor, the court imposed a sentence of ten-to-fifteen years to serve, which was less than the maximum—life imprisonment under the habitual-offender enhancement—

13

and less than the ten-to-twenty-five years the State recommended. Defendant contends that the court gave the State "the benefit" of a twenty-five-year sentence when it imposed the sentence consecutive to defendant's currently imposed sentence for an unrelated conviction, which has a maximum release date in 2032. However, the State was clear that its request was for ten-to-twenty-five years to serve imposed consecutively to defendant's current sentence. Accordingly, we see no indication that the trial court intended to penalize defendant for exercising his right to trial by imposing a sentence out of proportion to the maximum penalty or to the State's recommendation. See Hughs, 2018 VT 74, ¶ 17.

¶ 32. As to the second factor, the vast majority of the court's sentencing statements were focused on legitimate sentencing matters. The court noted the factors it was required to consider, expressly declined to comment on defendant's refusal to accept a plea offer, and observed that the presentencing investigation demonstrated that defendant was not taking responsibility for the convictions. The court did opine that "folks who enter pleas prior to trial tend to get a better result because they've accepted responsibility." However, "[a] defendant's acceptance of responsibility for the offense, and a sincere demonstration of remorse, are proper considerations in sentencing." State v. Sims, 158 Vt. 173, 188-89, 608 A.2d 1149, 1158 (1991) (explaining that such actions are important steps toward rehabilitation). The court's pretrial statements concerning the status of the plea negotiations, and characterizations of the plea offer itself, while not best practice, similarly related to whether defendant was willing to accept responsibility in light of the possibility of life imprisonment.[6]

¶ 33. Under the third factor, the court's challenged comments occurred in the context of defendant's refusal to accept responsibility. Defendant maintained his innocence and exercised

---

[6] While defendant recounts the court's pretrial statements in his statement of facts, he does not expressly argue that those statements contributed to the court's sentencing decision. However, we discuss them in the interest of canvassing the entire record.

his right to trial, called the convictions "bullshit" in the presentencing investigation, and did not apologize, express remorse, or make any other statement indicating acceptance of responsibility at sentencing. Defendant was well within his rights to conduct himself in this way, and the court could accordingly take that conduct into account as representative of his failure to take responsibility for the convictions, and to fashion an appropriate sentence. The court did not abuse its discretion.

¶ 34. Therefore, we affirm the order denying defendant's motion to suppress, his judgment of conviction, and the sentence imposed.

Affirmed.

FOR THE COURT:

_____

Associate Justice

15